## GARESCHE *et al.* v. LEVERING INVESTMENT COMPANY *et al.*, *Appellants*.

### Division One, December 8, 1898.

1. **Will:** DUTY OF TRUSTEES. It is the duty of trustees to whom has been committed an estate in trust, to collect and preserve intact, the trust property. They have no power to change the character of that property unless it is of a perishable or transitory nature, and then only to convert it into a substantial, enduring and revenue-producing investment.

2. ———: ———: POWER TO INCORPORATE ESTATE: GOOD FAITH. Unless the will gives the executors and trustees power to incorporate the estate, it can not be done. Whether or not they acted in good faith, or whether or not such incorporation was beneficial to the estate, does not enter into the question, if no such power was given.

3. ———: ———: ———: POWER TO SELL AND REINVEST. It is held in this case that a power given by the will to the executors and trustees to sell and reinvest, did not confer on them the power to change the charater of the estate and convert it into a corporation.

4. ———: MEANING OF "DISTRIBUTION." Where a testator provided that at his wife's death his estate should be "distributed share and share alike" among certain devisees, and designated no special method of distribution, it will held that the estate is to be distributed according to the methods provided by law for the distribution of estates.

5. ———: TRUSTEES: TENURE OF OFFICE. Where an estate is given to executors and trustees during the continuance of a life estate, the trust ceases at the termination of the life estate. They have no power to prolong their tenure of office or guardianship over the estate, or to tie up the interests of the remaindermen, by incorporating it.

6. ———: INCORPORATION OF ESTATE: ESTOPPEL. Where it is insisted that a remainderman is estopped from drawing in question the legality of the incorporation of an estate by the trustees, it must appear that he consented thereto with a full knowledge of all the material facts and circumstances and with a knowledge of his legal rights, and it must also appear that the position of the party invoking the estoppel would be changed if the matter was opened up. The actions of plaintiffs, tested by this rule in this case, did not estop them from denying the legality of the incorporation.

7. ———: ———: SALARY: COMMISSIONS. Where an estate consisting of realty is illegally incorporated by the executor, he is not entitled to a salary for acting as its president, nor a commission on the face value of the company's stock for acting as executor, and the amounts received by him in these capacities must be brought into the accounting, although the commissions have been allowed by the probate court; but if he is also trustee he is entitled to a reasonable compensation as such for managing the estate.

*Appeal from St. Louis City Circuit Court.*—HON. JOHN A. TALTY, Judge.

AFFIRMED.

*A. & J. F. Lee* for appellants.

(1) Upon the formation of the company the property of the estate was represented by the stock of the company, which was under the joint control of both trustees, and Mrs. Levering was not in any way excluded from the trust. (2) *First.* No excessive commissions have been charged. The stock of the company having come into the hands of the executors as such, and been distributed by them, they were entitled to commissions on that stock. *Jacobs v. Jacobs*, 99 Mo. 436; R. S. 1889, sec. 222. *Second.* The final settlement is conclusive on Mrs. Garesche, and the allowance to the executors can only be set aside for fraud. *Miller v. Major*, 67 Mo. 247. *Third.* The commissions were due and paid equally to both executors. *In re Seitz*, 6 Mo. App. 253; *Schoenick v. Reed*, 8 Mo. App. 357. *Fourth.* If the executors were not entitled to commissions on the stock of the company, then for all of the services rendered by them in the organization of the company and the purchase and sale of real estate, they should have received compensation as trustees. (3) The cardinal rule for the interpretation of Mr. Levering's will is his intention as gathered from the whole

will, and his surrounding circumstances. *McMillan v. Farrow*, 141 Mo. 62; R. S. 1889, sec. 8916; *Mersman v. Mersman*, 136 Mo. 244; *Garth v. Garth*, 139 Mo. 465. (4) The power to convey to the corporation was given by Mr. Levering's will. Black's Law Dictionary "Dispose;" Webster "Dispose of;" *Granger v. Scott*, 1 C. B., 448; *Gordon v. Preston*, 1 Watts, 385; *Phelps v. Harris*, 101 U. S. 370; *Bullene v. Smith*, 73 Mo. 161; *Drake v. Crane*, 127 Mo. 85. (5) The words "invest and reinvest" do not limit the transaction to one dealing in cash proceeds. *Phelps v. Harris*, 101 U. S. 370; *Drake v. Crane*, 127 Mo. 85. (6) The court will not review discretionary powers exercised in good faith. Perry on Trusts [Ed. 1889], secs. 452–511; *Haydell v. Hurck*, 72 Mo. 257.

*Silas B. Jones* for respondents.

(1) Under the English equity law a trustee, holding funds for investment for his *cestui que trust*, in the absence of directions on the subject in the trust instrument, is bound to make the investment in the public debt, for the safety whereof the faith of the government is pledged; or in loans, for which real estate is pledged as security. *King v. Talbot*, 40 N. Y. 83; *White v. Sherman*, 168 Ill. 589. Under the English rule trustees can not invest the trust funds in the stock or shares of any trading, manufacturing, or other private corporation. 1 Perry on Trusts [4 Ed.], sec. 455; *Lamar v. Micou*, 112 U. S. 452. And to this extent the English rule is now adopted by the decided weight of American case law. *King v. Talbot*, 40 N. Y. 76; *Adair v. Brimmer*, 74 N. Y. 539; *Tucker v. State*, 72 Ind. 242; *Simmons v. Oliver*, 74 Wis. 633; *White v. Sherman*, 168 Ill. 589; *Randolph v. East Birmingham L. Co.*, 104 Ala. 355; *Lamar v. Micou*, 112 U. S. 452. (2) Trustees have

no power to invest trust funds in the bonds or stocks
of new corporations, where the success of the business
has not become established; that trustees have no power
to embark trust funds in new enterprises, when the un-
dertaking must, in the nature of things, be experi-
mental. 1 Perry on Trusts [4 Ed.], sec. 459; *Mattocks
v. Moulton*, 84 Me. 545; *Adair v. Brimmer*, 74 N. Y.
539; *Tucker v. State*, 72 Ind. 242; *Kimball v. Reding*,
11 Foster, 352; *Simmons v. Oliver*, 74 Wis. 633; *Ran-
dolph v. E. B. Land Co.*, 104 Ala. 355; *Ihmsen's Ap-
peal*, 43 Pa. St. 431.    (3) There are no direct adjudi-
cations in this State declaring specifically in what trust
funds may be invested; but in so far as any intimations
are given in the decided cases in this State, there is no
disposition here to in any manner relax the rules on
the subject declared by other courts. *Drake v. Crane*, 127
Mo. 85; *Garesche v. Priest*, 9 Mo. App. 263; s. c., 78 Mo.
126; *Gamble v. Gibson*, 59 Mo. 585; R. S. 1889, secs.
102–5318. (4) If the instrument creating the trust com-
mits the investment in general terms to the discretion
of the trustees, that discretion is controlled by the rules
of law on the subject of the investment of trust funds,
and must be exercised within the limits which they pre-
scribe. *King v. Talbot*, 40 N. Y. 76; *Mattocks v. Moul-
ton*, 84 Me. 545; *Kimball v. Reding*, 11 Foster, 352;
*Randolph v. E. B. Land Co.*, 104 Ala. 355; *Butler v.
Butler*, 164 Ill. 171; 1 Perry Trusts, sec. 460; 2 Pom.
Eq., sec. 1073.    (5) The duties and powers of trustees
can not be delegated to others, unless there is express
authority for that purpose given in the instrument
creating the trust.    The office of trustee is one of per-
sonal confidence and can not be delegated.    1 Perry
Trusts [4 Ed.], sec. 287; 2 Pom. Eq., sec. 1068; *Whit-
telsey v. Hughes*, 39 Mo. 13; *Graham v. King*, 50 Mo.
22; *Howard v. Thornton*, 50 Mo. 291; *Bales v. Perry*,
51 Mo. 449; *Buckenkamp v. Rees*, 69 Mo. 426; *Cassady*

*v. Wallace*, 102 Mo. 575. (6) Trustees can not use their power to invest trust funds in any manner whatever, directly or indirectly, for their own personal gain or advantage; and no disguise whatever of a transaction will be permitted to give it validity, if the substance of the transaction be a use by a trustee of trust funds for his personal advantage. 1 Perry Trusts, sec. 464; 2 Pom. Eq., sec. 1075; *Bermingham v. Wilcox*, 52 Pac. Rep. 822; *Thornton v. Irwin*, 43 Mo. 153; *Gamble v. Gibson*, 59 Mo. 585; *Patterson v. Booth*, 103 Mo. 402; *Ward v. Davidson*, 89 Mo. 445; *Bent v. Priest*, 10 Mo. App. 543; *State ex rel. v. Jones*, 53 Mo. App. 207. (7) A remainderman can not by mere silence acquiesce in an investment, until his interest falls into possession so as to be bound. 1 Perry Trusts, sec. 467; Bispham's Hill Trustees, star p. 528; *Bennett v. Colley*, 5 Simons, 181; *Brown v. Cross*, 12 Beavan, 105; *White v. Sherman*, 168 Ill. 589; *Lindell R. E. Co. v. Lindell*, 142 Mo. 61.

MARSHALL, J.—This is a proceeding in equity to divest the title to property, real and personal, out of the Levering Investment Company, and vest it in the devisees under the will of Lawrason Levering, and to secure an accounting.

On the 20th of September, 1889, Lawrason Levering died, testate, and seized of a large estate, real and personal. After specific legacies, not here involved, the will provided: "All the rest and residue of my estate, real, personal and mixed, of whatever kind, and wherever situated, I give, devise and bequeath to my wife, Brianna Levering, and Robert B. Whittemore, and the survivors or survivor of them, upon the following uses and trusts: In trust to pay my wife, Brianna Levering, in cash, so long as she shall live, and for uses and support, and in such

sums and such times as she may desire and deem proper. I also give my executors, hereinafter named, full authority to sell, exchange, lease, convey, or in any other way dispose of the property, real, personal and mixed, given to my wife during her life, and to invest and reinvest the proceeds arising therefrom as they may deem best for the interest of my wife and others interested in this, my last will and testament. It is my will and desire upon the death of my wife, and I give, devise and bequeath all the remainder of the property given to my wife, during her life, real, personal and mixed, to be equally distributed among my daughter, Kate Whittemore, and our grandchildren, share and share alike,'' etc. He appointed his wife, Brianna Levering, and his son-in-law, Robert B. Whittemore, executors, to serve without bond.

The will was duly admitted to probate, and letters testamentary granted to the executors selected by the will in September, 1889. The devisees were a daughter (Katie Whittemore) and fourteen grandchildren. Mrs. Levering took no active part in the management of the trust estate, but let Mr. Whittemore control it, ratifying, however, whatever he did. The executors, pending the administration, without permission of any court and pursuant to the power contained in the will, sold parts of the real estate and reinvested the proceeds in other real estate.

Before the close of the administration, and on June 23, 1890, Robert B. Whittemore (the co-executor), his two sons, Robert B., Jr., and Lawrason L., together with John S. Parrish, a clerk and stenographer in the office of Mr. John F. Lee, attorney for the executors, organized the Levering Investment Company, under article 8 of the corporation laws of this State, with a capital stock of $300,300, divided into 3,003 shares of a par value of $100 each, of which Mr. Whittemore and

his two sons subscribed for one share each, and John
S. Parrish subscribed for 3,000 shares of the par value
of $300,000, and it was stated in the articles of agree-
ment that one half of the stock was paid up in lawful
money of the United States and was in the custody of
the first board of directors. Mr. Parrish was not a
capitalist, and was used as a means of organizing the
corporation, and was to profit or lose nothing by the
transaction. To secure the money to pay up the fifty
per cent of the three thousand shares subscribed for
by him, Mr. Whittemore and his two sons made their
joint note to a bank, the proceeds of which were placed
to their credit, they three being the first board of di-
rectors of the new company. The said board of directors
then purchased from Mrs. Levering and Mr. Whitte-
more, as executors and also as trustees under the will,
practically all the property of the Levering estate, at
the price of $150,000, and the property was conveyed
by them to the company, and the company turned over
to them the $150,000, which was secured from the bank,
as aforesaid, and thereupon Mrs. Levering and Mr.
Whittemore, as such trustees, purchased from Mr. Par-
rish the three thousand shares of the capital stock of
the Levering Investment Company, for which he had
subscribed for $150,000, but instead of paying Parrish
the money, he agreed that the executors and trustees
should apply the money ($150,000) to the payment of
the note of Mr. Whittemore and his two sons given to
and discounted by the bank in the manner described,
which was accordingly done. In this way the $150,000
was employed to pay up Parrish's subscription for
$300,000 worth of stock, and to pay the executors for
all the property of the Levering estate, and to buy
Parrish's stock in the new company and to pay the
Whittemore note to the bank, and actually no part
of the money ever left the bank for an instant. The

devisees were not consulted and their consent was not asked or given to this arrangement and scheme.

Howbeit, the new company became the owner of all the property of the Levering estate, the executors reported that the personal property of the estate amounted to $315,850.24 (of which $300,000 was the stock so acquired), and they were allowed five per cent commission thereon, amounting to $15,000; they made final settlement, turned over the stock to themselves as trustees, and were discharged as executors.

The executors and trustees say that the purpose of this transaction was to prevent and avoid the expense of a partition of the property, and to preserve the estate intact and prevent a sacrifice of the property at a public partition sale.

As Mrs. Levering had a life estate, the trustees held all the three thousand shares of stock, and voted it at all elections held by the company. Mr. Whittemore was made president of the company, and paid a salary of $200 a month, from July 1, 1890, to July 1, 1892, amounting to $4,800, and of two hundred and fifty dollars a month, from July 1, 1892, to February 1, 1896 (when this suit was brought), amounting to $10,500, and aggregating $15,300. Mrs. Levering was paid the income from the estate, thus corporationized, until her death in August, 1895, having received in this way some $38,000. She, having taken no part in the management of the estate, turned over her share of all commissions allowed the executors to Mr. Whittemore.

Thus the matter stood in August, 1895, when Mrs. Levering died. In September, 1895, all the remaindermen were invited to the house of Mr. Whittemore. Statements were made by him and his attorney as to the management of the estate. It was represented that under Mr. Whittemore's wise management the estate had nearly doubled in value since Mr. Levering's

death.    The matter of compensation to Mr. Whitte-
more was then brought up.    It was stated that he had
received the commissions allowed by the probate court,
and it was also understood that he had been receiving
a salary as president of the company, but it was asserted
that he had received nothing as trustee, and that a
proper compensation to him as trustee could either be
allowed him by the devisees, or the matter would have
to be settled in court.    Thereupon the sum of $10,000
was agreed to be allowed him, one half to be paid in
cash and the other half in stock.    After deducting the
stock so allowed, the stock of the company was dis-
tributed among the remaindermen, according to their
respective shares under the will.

Between September, 1895, and February, 1896,
the dividends on plaintiff's interest in the estate, which
is valued at from $20,000 to $25,000, amounted to
$530.33, of which $333.33 was applied as her part of
the $5,000 cash allowance to Whittemore, and $197
was paid to her.    She and her husband were shown to
be inexperienced in business matters and do not seem
to have a very clear idea of the workings of a corpora-
tion.    No one even attempted to explain to her how
the estate of her grandfather came to be vested in a
corporation, nor had she ever seen the will, but when
Whittemore undertook to explain the matter to her
husband he told Whittemore he could talk to him until
doomsday and not convince him that it was to the in-
terest of Mrs. Garesche that Mr. Whittemore should
manage her affairs, and that he would rather lose his
property than have it managed by any one else, no
matter how honestly or efficiently it was managed.
Mrs. Garesche consulted attorneys, who, upon investi-
gation, gave the opinion that the transfer of the prop-
erty to the corporation was illegal, demanded her share
of the estate and, being refused, instituted this action'

asking to have the title to the property divested out of
the company and vested in the devisees, for an
accounting by the executors and trustees, for the
appointment of a receiver and for a partition.   The
circuit court entered a decree divesting the property
out of the company and vesting it in the devisees, as
tenants in common, directing an accounting and ap-
pointing a special master to state the account, appoint-
ing a receiver, finding that the property is not
susceptible of partition in kind, and appointing a
special commissioner to sell it and directing the per-
sonal property to be turned over to the receiver.   De-
fendants then appealed to this court.

I.

With commendable zeal and industry the counsel
on both sides have presented this case, both by able
oral arguments and upon voluminous and exhaustive
printed briefs, covering a wide field of research and
investigation, and raising a multiplicity of questions
as to the powers and duties of trustees, but they have
been compelled to admit that they have found no case
that is a precedent for this.   The truth is that the case
lies in a small compass.   The fact that it is the first
instance where executors or trustees under a will, with
power to sell and reinvest, have ever attempted to in-
corporate the estate without the consent of the *cestuis
que trustent*, is, in itself, persuasive that until now no
such power was ever thought by the profession to be
possessed by such trustees.   The law has long been
regarded as settled that it is the duty of trustees to
collect and preserve, intact, the trust property, and
that they have no power to change the character of the
trust property, unless it is of a perishable or transitory
nature, and then only to convert it into a substantial,

enduring and revenue-producing investment. Converting personalty into realty has been often sanctioned by courts of equity, and selling real estate and reinvesting in personal property is within the power of a court of equity, when it is for the interest of the *cestui que trust.* *Mason v. Bank of Commerce,* 90 Mo. 452; Perry on Trusts, sec. 449. It is likewise an old rule of equity that trustees shall not, without leave of court, invest trust moneys in personal securities. Perry on Trusts, sec. 460. The rule has been relaxed in some states so as to permit investments in bonds, other than governmental, and in stocks of corporations that are firmly established and of recognized standing among prudent business men. Perry on Trusts [4 Ed.], secs. 452 to 460. In *Gamble v. Gibson,* 59 Mo. l. c. 595, WAGNER, J., delivering the opinion of the court, said: "The general doctrine is, that a trustee has no power to change the character of the trust fund, and if a change be deemed necessary, or for the interest of the beneficiary, the permission or sanction of the court should be obtained. This rule is necessary for the preservation of the fund. The temptations to tamper with the fund by a trustee are so powerful and so numerous, the hopes of bettering the estate so often prove delusive, that the power of changing the character of the fund is most safely reposed in the discretion of judicial tribunals. This is the invariable rule in reference to converting money into real estate or real estate into money." In *Drake v. Crane,* 127 Mo. l. c. 106, BURGESS, J., said: "We quite agree with counsel for defendants, and as abundantly shown by the authorities cited by them in their brief, that, where, by the provisions of a will, trustees therein named are empowered to invest and reinvest the funds of the estate, a duty is imposed upon them to so place the money that it shall be safe and productive (*Gray v. Fox,* 1

Saxt. Ch. 259); and the investment of trust property should be made with a view of permanency, and not in a spirit of speculation."

In *Haydel v. Hurck*, 5 Mo. App. 1. c. 274; 72 Mo. 253, the will granted to the executor and the testamentary trustee full power to "sell, deed in trust, lease, mortgage, convey, or in any manner dispose of the same at private or public sale," and the court said: "A court of equity will never favor a construction that confers upon the trustee absolute and uncontrollable powers. *Tophan v. Duke of Portland*, 1 De G. J. & S. 568. In this case the will provides: 'The proceeds of such sale, together with the rents, income, or revenue of my estate, my said trustee may invest and reinvest in such securities as to him may seem best.' The intent and purpose of all such powers is universally held to be the preservation and amelioration of the trust estate. It is said that trustees ought always to have an immediate and advantageous investment in view before they sell existing securities. *Watts v. Girdlestone*, 6 Beav. 188; *Wormley v. Wormley*, 8 Wheat. 421. A sale for the mere purpose of converting real estate into personal, or vice versa, or without some well defined and proper purpose in view, will render the trustee responsible for any resulting loss."

In the case at bar the trust property was principally real estate. The executors sold the portions which appeared likely to depreciate in value, and reinvested in other real property. Of this there is no complaint except as to the apportionment of the proceeds, to which fuller reference is hereafter made. At the time the estate was thrown into the corporation the character of the trust property was unexceptionable, and no loss or depreciation was threatening. The whole scheme was to place the title to the property, real and personal, in the corporation, so as to prevent a partition

at the instance of any of the devisees, and to save the expense and alleged loss incident to and arising out of a partition proceeding, with a public sale. Much stress is laid by defendants on the allegations of the bill that it was done fraudulently, to obtain a personal advantage by the trustee, Whittemore, and much testimony was taken which shows that it was done in good faith and under the advice of counsel learned in the law, and the increase in the value of the trust estate in five years, is pointed out as proof of the wisdom of such an arrangement. For the purpose of this case, the perfect good faith of the trustee, Whittemore, the fact that he acted under legal advice, and the increase in the value of the trust property, may be fully conceded. Yet the case is not dependent upon any of these considerations. It is a question of the power of the executors and trustees under the terms of the Levering will—of whether the power to sell and reinvest gives the authority to the executors and trustees to incorporate the estate. If there is no such power conferred by the will, the *bona fides* of the executors and trustees, and the benefits accrued to the trust property can not justify the proceeding.

The will itself nowhere gives any intimation of any such idea in the mind of the testator. He provided for his wife for life, and after her death directed the remainder of his property, "real, personal and mixed," to be equally *distributed* among my daughter, Katie Whittemore, and our grandchildren, share and share alike." This language can not impart the idea that the trust estate was to be changed in character and converted into a corporation, and the shares of stock distributed. The corporation is organized for a duration of fifty years. The Whittemore branch of the devises controlled about two thirds of the stock— the Levering share comprising only one third. When

Levering directed that upon the death of his wife, the property remaining "real, personal and mixed," should be distributed among the devisees share and share alike, he can not fairly be said to have intended that the Leverings should become minority stockholders in a corporation that was to hold the property he left for fifty years, and that these devisees were only to have the benefit of his devise, whenever the majority of the stockholders chose to declare dividends, nor that the management of the interests bequeathed to the Leverings should be in the hands of the Whittemores exercised by a majority vote of the stock, and executively attended to by the officers, who were of the Whittemore devisees. The testator was a man of wealth and experience, and when he directed that his property should be *distributed*, share and share alike, he could have meant only, that as he provided no special method of distribution, the methods provided by law should be followed, that is, that the property should be divided between the legatees by the voluntary act of the parties themselves or failing in that the aid of the courts should be invoked, and the property partitioned in kind if possible, otherwise it should be sold and the proceeds be distributed. The executors and trustees were clothed with power over the property only until the termination of the life estate. Then the trust ceased. They were not authorized to prolong their tenure of office. They were not charged with any right or duty to act as guardians for the remaindermen and protect them and the property from their own improvidence or from the expenses and sacrifices incident to the recognized legal methods of partitioning undivided interests. In other words the plan adopted in this case by the trustees was to establish a protectorate over the property, and to deprive the true

VOL. 146 mo—29

owners of one of the elements of ownership, the right to manage, control, squander, waste or give it away as they saw fit. The plan is without precedent in the law, and is a doubtful compliment to the wisdom and justice of the law, and as the experience of mankind for ages affords no example for the transaction, the courts can not be expected to look upon it with admiring eyes. The evidence discloses that by thus converting the realty into stock the executors were allowed five per cent commission on three hundred thousand dollars, or $15,000, not one cent of which could they have been allowed if it had remained realty; that Whittemore received $15,300 as president of the company from July 1, 1890, to February 1, 1896, and that at the termination of the life estate he procured the assent of the devisees to a further allowance of $10,-000, because under his wise management the estate had doubled in value in five years (though how his management effected it is by no means clear from the evidence), thus in commissions, salary and bonus, he obtained forty thousand three hundred dollars in five years and a half, whereas if he had not converted the real estate into stock of a corporation he would have been entitled only to the usual commissions allowed trustees. If the property had been partitioned, the legal costs and expenses, which the trustees so much feared, would never have reached anything like so large a sum. The other alleged purpose of holding the estate intact, and reducing the expense of handling it, is likewise dissipated by the evidence, for it appears that the expense of managing the business from 1891 to 1895, estimated on a basis of every one hundred dollars collected was, for 1891, 42 per cent; for 1892, 63 per cent; for 1893, 75 per cent; for 1894, 64 per cent and for 1895, 61 per cent; and that Whittemore's salary, as president, amounted to from thirteen to

seventeen per cent of the gross income, or from thirty to thirty-three per cent of the net income. The advantage to the beneficiaries of this scheme over the legal methods are not therefore easy to discern. But our attention has been called to other estates that have been incorporated, as the Collier, Tyler and Turner estates. The evidence does not disclose whether this was done with or without the consent of the heirs and beneficiaries, but if it was with the consent of persons *sui juris*, it would be good as a contract *inter sese;* if without such consent it would be of no more legal effect than what was done in this case. It is perfectly clear that the executors and trustees had no power to convert the property of the estate into stock in a corporation. The power conferred by the will was only intended to authorize the sale of such portions of the property as were likely to depreciate in value, and the reinvestment of the proceeds in some other property of recognized value and of a durable character. No power was granted them to tie up the interests of the remaindermen, to retain for years a control of the property or to invest the proceeds in stock of a corporation where only fifty per cent was paid up and the devisees who accepted the stock were left liable for unpaid stock subscriptions. Neither can any authority be found in the law for such a proceeding.

## II.

But it is insisted that the plaintiffs are estopped from drawing in question the legality of these acts. To constitute an estoppel it must appear that the party acted with full knowledge of all the material facts and circumstances and with a knowledge of his legal rights, and that the position of the party invoking the

doctrine would be changed if the matter was opened up.
*Gamble v. Gibson*, 59 Mo. l. c. 597; *Noble v. Blount*,
77 Mo. 235; *Blodgett v. Perry*, 97 Mo. 263; *Taylor v.
Zepp*, 14 Mo. 482; *Terrill v. Boulware*, 24 Mo. 254;
*Burke v. Adams*, 80 Mo. 504; *Olden v. Hendrick*, 100
Mo. 533.    Herrman on Estoppel, section 1062, states
the rule to be: "To fix acquiescence upon a party,
it must unequivocally appear that he knew or had
notice of the fact upon which the alleged acquiescence
is founded, and to which it refers.    Acquiescence im-
ports and is founded upon knowledge.    Acquiescence
can not arise unless the party against whom it is set
up is aware of his rights.    A person can not acquiesce in
what he is ignorant of, nor can he be bound by acqui-
escence unless fully apprised as to his rights and all
the material facts and circumstances of the case."

In this case it is not pretended that Mrs. Garesche
was advised or consulted about the conversion of the
land into stock in the company, nor that any of the
facts or circumstances were communicated to her, nor
that she knew them or understood her rights.    In fact
at the so-called ratification meeting at Whittemore's
house, after Mrs. Levering's death, there was no ren-
dering account of stewardship by the trustee, in any
proper sense; it partook rather of generalities as to
the increased value of the estate, upon which to predi-
cate a claim for an additional bonus to the trustee.
She can not be said to have had knowledge of her
rights nor of the facts and acts which she is claimed to
be estopped to deny.    When Mrs. Knapp, one of the
devisees, asked Mr. Whittemore by what authority the
estate had been incorporated, he answered, by author-
ity of her grandfather's will under the power "to invest
and reinvest," and his son Robt. B. Whittemore said,
"By order of the court."    It is upon this sandy
foundation that the temple of estoppel—good con-

science—is built in this case.   The evidence is wholly insufficient to establish either an estoppel or a ratification.   The meeting was in September and within a short time—a few weeks—Mrs. Garesche consulted a lawyer, who, upon investigation, advised her the plan was illegal, and she refused to attend any more meetings, and made a formal demand for her share of the estate, and failing, instituted this suit, the following April.   No laches, even, can be ascribed to her.   When Mr. Whittemore talked to her husband about it, he promptly repudiated the scheme, and told him he could talk to him until doomsday and not convince him that it was to his wife's interest to have any one manage her affairs—that he would rather lose it all than have any one else manage it no matter how honestly it was done.   There is, therefore, no merit in the claim of estoppel or ratification in this case.

## III.

As the circuit court referred the case to a special master to take an account, and as no judgment on an accounting was rendered against the trustee in that court, it is only necessary to say that whether the executor gave the estate its proper portion of the proceeds of the sale of the former residence property and the adjoining property belonging to the executor, is a question of fact, which must be settled in the accounting, and that if the houses were substantially the same, and the land of equal value per foot, as Mr. Whittemore testified was the fact, the estate should receive eleven sixteenths and Mr. Whittemore five sixteenths of the $37,000, as the estate owned one hundred and ten feet, and Mr. Whittemore fifty feet, which would make the estate's interest $25,437.50 and that of Mr. Whittemore $11,562.50.   Mr. Whittemore gave the estate credit for $21,000 which, upon the basis of value

so placed upon the property by Mr. Whittemore himself, was $4,437.50 less than the estate was entitled to, and for which he should be held accountable.

Inasmuch also as Mr. Whittemore received as executor, $15,000 as commissions on the property turned into stock, and inasmuch as he was not entitled thus to change the character of the trust property, and as executor he was not entitled to any commissions on the real estate, his accounts should be surcharged by deducting from the $15,000, the proportion thereof which represented the realty turned into stock, and allowed only the portion which represented commissions on the personalty distributed.

As the $10,000 bonus allowed Mr. Whittemore at the first meeting of the heirs after the termination of the life estate was based upon claimed meritorious and beneficial services rendered the estate, and as it was allowed, so far as the plaintiff is concerned, without full knowledge of the facts and upon the erroneous supposition that he had power under the will to do as he had done or that it had been done by order of court, it can not be allowed to stand, and the cash and stock so received must be brought into the accounting.

The formation of the corporation being illegal, Mr. Levering is not entitled to any salary for acting as its president, and the $15,300 received as such must also be brought into the accounting. This restores the legal *status quo* of the parties, and Mr. Whittemore must be allowed a reasonable compensation as trustee for managing the trust property. *Tracy v. Railroad*, 13 Mo. App. 295; s. c., 84 Mo. 210; *Kemp v. Foster*, 22 Mo. App. *l. c.* 649; *Gamble v. Gibson*, 59 Mo. *l. c.* 593.

The decree of the circuit court was right, and the orders made regular and proper, and it is, therefore, affirmed.   All concur.