[L. A. No. 6983. In Bank.—February 8, 1922.]

## In the Matter of the Estate of AARON COVER, Deceased.

[1] Estates of Deceased Persons—Petition for Revocation of Letters of Administration—Marriage Settlement Agreement—Invalidity of—Jurisdiction.—In a proceeding for the revocation of letters of administration issued to the widow of a deceased person, upon the ground that she had ceased to be an heir of the deceased by virtue of the terms of a marriage settlement agreement, the superior court sitting in probate has jurisdiction to try the issue presented by the widow that she was induced to make the agreement by actual undue influence exercised by the deceased, his son and another.

[2] Id.—Defense of Fraud—Statute of Limitations—Laches.—In a proceeding for the revocation of letters of administration issued to the widow of a deceased upon the ground that she had waived her right to letters of administration by entering into a marriage settlement agreement, neither the statute of limitations nor the plea of laches on her part can be set up to defeat the defensive relief sought by her in the claim that the agreement was entered into by her under undue influence exerted by the deceased and others.

[3] Id.—Defense of Fraud—Time for Making.—While it is the rule generally that a cause of action grounded in fraud must be instituted within three years from the time of the discovery of the fraud, that rule does not apply to a defense interposed upon the ground of fraud in a case where it is affirmatively sought to have declared valid and enforceable a contract claimed to have been signed and consummated in fraud. In such a case neither the limitations of the statute nor the doctrine of laches will operate to bar the defense of the invalidity of the agreement upon the ground of fraud, for as long as the plaintiff is permitted to come into court seeking to enforce the agreement, the defendant may allege and prove fraud as a defense.

[4] ID. — CONFIDENTIAL AND FIDUCIARY RELATIONS. — Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. The very existence of such a relation precludes the party in whom the trust and confidence is reposed from participating in profit or advantage resulting from the dealings of the parties to the relation.

[5] ID.—HUSBAND AND WIFE—DEALINGS BETWEEN—BURDEN OF PROOF. Confidential relations are presumed to exist between husband and wife, and, in his dealings with his wife, the husband, if he obtains an advantage over her, must stand unimpeached of any abuse of the confidence presumptively reposed in him by the wife and resulting from the marital relation, and, failing in this, he must bear the burden of showing that the transaction was fair and just and fully understood by the party from whom the advantage was obtained.

[6] ID.—UNDUE INFLUENCE—LACK OF PRESUMPTION.—The mere existence of the marriage relation alone will not in and of itself suffice to initiate and support the presumption of undue influence where the transaction between husband and wife is *prima facie*, or, from all the circumstances thereof, shown to be fair and free from any material advantage to the husband from and over the wife.

[7] ID. — DEALINGS BETWEEN HUSBAND AND WIFE — GOOD FAITH. — A husband, by reason of the marital relation, is bound in his dealings with his wife to the highest and best of good faith, and, as a consequence, is obligated in such dealings not to obtain and retain any advantagé over her resulting from concealment or adverse pressure, and he must, if he would avoid the presumption of undue influence emanating from the procurement of any advantage over her, make full and fair disclosure to her of all that she should know for her benefit and protection concerning the nature and effect of the transaction, or else he must deal with her at arm's-length, as he would a stranger, all the while giving her the opportunity of independent advice as to her rights in the premises.

[8] ID. — UNDUE INFLUENCE — SUFFICIENCY OF EVIDENCE. — In such a case the evidence is sufficient to sustain a finding of undue influence inducing the execution of the agreement where it is shown that the widow executed the same in ignorance of her rights and without independent advice as to its meaning and effect, releasing her expectancy to a substantial portion of the two hundred thousand dollar estate in return for a consideration obviously inadequate, and that the agreement was drafted at the direction of the deceased and executed by the widow at his instigation "in respect for the wishes" of the deceased, without any disclosure by him to her of the then value and character of his estate or of the rights which she was called upon to surrender by the agreement.

[9] ID.—WEALTH OF DECEASED—KNOWLEDGE OF VALUE OF ESTATE.—
The fact that the widow may have known at the time of the
execution of the agreement in such a case that the deceased had
the reputation of being a very wealthy man did not in and of
itself suffice to impute knowledge to her of the value and character
of his estate at that time.

[10] ID.—ACCEPTING BENEFITS OF AGREEMENT—ESTOPPEL.—Accepting
and retaining the benefits of the agreement, in such a case, in con-
tinuing ignorance of the effect thereof upon her right to succeed
to a portion of the estate of the deceased in the event of his dy-
ing intestate, did not operate as an estoppel upon the widow, for
to constitute an estoppel it must be made to appear that she acted
with full knowledge of all material facts and circumstances and
with full knowledge of her rights in the premises.

[11] ID.—LEAVING PROPERTY IN STATE—ADMISSION OF PLEADING.—
In such a case an admission in the pleadings that the deceased
died leaving real property in the state must be treated as a fact
found and is controlling.

[12] ID.—RIGHT TO LETTERS.—In such a case, where the court found
that all the property possessed by the deceased at the time of the
making of the agreement and at the time of his death was separate
property, the fact that he deeded practically his entire estate to
his son immediately following the making of the agreement in
controversy would not remove the widow's cause for complaint
against the making of the agreement where it is found that the
deceased died leaving an estate undisposed of by law, as, but for
the interposition of the agreement in controversy, she would be
entitled to succeed to a portion thereof, with the concurrent pre-
ferential right to administer his estate.

[13] ID.—RESTORATION—SUFFICIENCY OF OFFER.—In such a case, where
the answer of the widow alleges that she "offers to account to the
legal representatives of the estate . . . for each and singular all
the property received by her pursuant to the terms of said con-
tract, and to do equity," this was a sufficient offer to restore.

[14] NEW TRIAL — NEWLY DISCOVERED EVIDENCE — DILIGENCE. —
Ordinarily, newly discovered evidence for a new trial is looked upon
with disfavor, and a party relying thereon must make a strong
showing of diligence on his part in preparing for trial.

APPEAL from a judgment of the Superior Court of
Los Angeles County. Paul J. McCormick, Judge. Af-
firmed.

The facts are stated in the opinion of the court.

Bicksler, Smith & Parke for Appellant.

Frank G. Tyrrell and Jarrott & Jarrott for Respondent.

LENNON, J.—The deceased, Aaron Cover, died intestate September 15, 1916, at Pasadena, California, where he had resided for the period of fifteen years. His widow, Mary Ann Cover, applied for letters of administration upon his estate and the same were granted and issued to her on October 8, 1919. She qualified as administratrix on October 14, 1919, and ever since has been acting in that capacity. This appeal is prosecuted from a judgment of the superior court of Los Angeles County, sitting in probate, entered upon the verdict of a jury denying the petition filed November 17, 1919, of S. A. Cover, a son of the deceased, praying for the revocation of the letters of administration previously issued to the widow of the deceased. The petition for revocation was grounded primarily upon allegations that under the terms of a marriage settlement agreement entered into in writing and executed December 24, 1909, by and between the deceased and his widow, the latter ceased to be an heir of the deceased because by virtue of the terms of the said marriage settlement agreement she, "in consideration of . . . and in respect of the wishes of the said husband," expressly released and waived "all right or claim which she may have in or to the estate of Aaron Cover at his death by virtue of being wife or widow . . . and every part and parcel of the said estate from all of her marital claims at his death . . . and all community right and dower right of whatsoever nature or kind which she has against the estate . . . " The petition for revocation of letters of administration alleged that said deceased left an estate in the county of Los Angeles consisting of an interest in certain designated and described real property in said county, and, after setting out *in haec verba* the said marriage settlement agreement, alleged its full performance by the deceased, and prayed, therefore, that said Mary Ann Cover be removed as administratrix of said estate, and that in her place and stead petitioner, said S. A. Cover, be appointed administrator of said estate. Answering the petition for revocation, the widow, in effect, admitted that, as alleged in said petition, the deceased died leaving an estate

in the county of Los Angeles, and expressly admitted that she signed the alleged marriage settlement agreement on December 24, 1909, and under and pursuant to its terms, and in consideration thereof, received from the deceased property of the value of about fourteen thousand dollars. She denied, however, that she thereby waived or intended to waive any of her marital rights in and to the estate of the deceased, or any of the rights vested in her by law, or that she thereby waived or intended to waive her right to act as administratrix of said estate, and in this behalf, further answering, alleged in substance and effect, throughout three separately stated defenses, an admixture of facts which, taken in their entirety, present the defense that she was induced to make the agreement as the result in part of actual undue influence, consciously and designedly exerted upon her by the deceased, his son, U. G. Cover, and one John Stoner, and proceeds in part upon the theory of presumptive undue influence, having its inception in and emanating from the fiduciary relation of husband and wife subsisting between her and the deceased at the time of the execution of the agreement. Concluding her answer to the petition for revocation, the widow of the deceased expressly offered "to account to the legal representative of the estate of Aaron Cover for each and singular all the property received by her pursuant to the terms of said contract, and to do equity," and then prayed that the petition of S. A. Cover for revocation of letters of administration issued to her be denied, that she have her costs, "and such other and further relief as may be meet and agreeable to equity."

[1] Appellant makes the contention that the superior court sitting in probate was without jurisdiction to hear and determine the issue of the invalidity of the agreement in controversy, claiming in this behalf that such issue was wholly collateral to the proceeding for the probate of the estate of the deceased and could, therefore, be determined in the first instance only by a direct equitable action instituted in another forum for that purpose. There is no merit in this contention. Section 1365 of the Code of Civil Procedure, in operation at the time of the making of the said agreement and at the time of the death of the deceased, provides that a surviving wife may be granted letters of

administration upon the estate of her deceased husband only when she is "entitled to succeed to his personal estate or some portion thereof."

It is conceded, as indeed it must be, that the agreement in question, if valid, operated to release and relinquish whatever right the widow of the deceased may have had, as widow and technical heir of the deceased, to succeed to any portion of his estate, and, therefore, under the provisions of the code section last quoted, deprived her of the right to administer said estate. (*Estate of Walker*, 169 Cal. 400 [146 Pac. 868]; *Elmendorf* v. *Lockwood*, 57 N. Y. 322; *Estate of Warner*, 6 Cal. App. 361 [92 Pac. 191]; *Warner* v. *Warner*, 144 Cal. 615 [78 Pac. 24]; *In re Davis*, 106 Cal. 453 [39 Pac. 756].)

It must be conceded that if, on the other hand, the agreement was invalid for fraud, it was ineffectual for any purpose, and could not, therefore, be interposed as an estoppel to the right of the widow to succeed to and administer the estate of her deceased husband. (*Malloney* v. *Horan*, 49 N. Y. 111 [10 Am. Rep. 335]; *Estate of Warner, supra*.)

The proceeding in the instant case was no more nor less than a contest for letters of administration, and, therefore, it was the duty of and within the jurisdiction of the superior court sitting in probate to determine which of the two contesting parties was entitled to letters of administration, and obviously, before such determination could be made, the court was required to consider and determine the validity of the agreement which purported to relinquish the right of one of the contesting parties to administer the estate.

The same situation, involving practically the same contention made here, was presented in the *Estate of Warner, supra*, where the respondent, a son of the deceased, was petitioning for letters of administration, and, at the same time, opposing the right of the widow to letters upon the ground that by virtue of a pleaded written agreement she had waived and relinquished all interest in the estate of the deceased. The widow, by answer to the opposition, alleged matters and things tending to show that the agreement was entered into as the result of fraud, and was not, therefore, legally binding upon her. In that case, the court, in holding against the sufficiency of a special demurrer to the

answer of the widow, based in part upon the ground that the court sitting in probate could not inquire into the matter of fraud, said: "An inspection of the written agreement when presented showed that she [the widow] was not entitled to administer on the estate. She had anticipated this by alleging in an appropriate pleading facts which, if true, would show that the agreement ought not to be held binding upon her. Before it could be determined whether she was entitled to administer, it was necessary for the court to determine the validity of the agreement, an issue as to its validity and binding force having been raised. The matter was being heard in the superior court, the jurisdiction of which is fixed by the constitution and not by acts of the legislature, and if the answer contained allegations of fact which, if true, showed that the agreement was procured by fraud or mistake or had not been executed by the parties, it was the duty of the court and it had the power to pass upon these issues. This view seems to be in harmony with the law as stated in *Re Burton*, 93 Cal. 463 [29 Pac. 36], wherein it is said: 'No distinct court of probate has been created or recognized by the present constitution of this state. The constitution has created superior courts and has given them original jurisdiction of the subject matter of various classes of actions and special proceedings more or less distinct from each other, among which are "all actions at law which involve the title or possession of real property" and "all such special cases and proceedings as are not otherwise provided for" and "all matters of probate." . . . The superior court, while sitting in matters of probate, is the same as it is while sitting in equity, in cases at law, or in a special proceeding, and when it has jurisdiction of the subject matter of a case falling within either of these classes, it has power to hear and determine, in the mode provided by law, all questions of law and fact, the determination of which is ancillary to a proper judgment in such case. This is an incidental power pertaining "to all courts for the purpose of enabling them to exercise the jurisdiction which is conferred upon them." ' "

[2] The statute of limitations and laches were pleaded by demurrer to the widow's answer as a bar to the defense of the invalidity of the agreement. Appellant relies appar-

ently, in so far as the plea of the statute of limitations is concerned, and by analogy with reference to the plea of laches, upon subdivision 4 of section 338 of the Code of Civil Procedure, which provides that a cause of action for relief on the ground of fraud is barred within three years, but that such cause of action is not deemed to have accrued until discovery by the aggrieved party of the facts constituting the fraud.

Apart from a consideration of the fact that the answer of the widow pleaded facts which, if true and necessary to her defense, removed that defense from the bar of the statute and beyond the bar of the doctrine of laches, we are of the opinion that neither the limitation of the statute nor the doctrine of laches may be invoked and applied against the widow's right to defend against the operation of the agreement.

The petition for a revocation of letters of administration previously issued to the widow was the initiatory step in a special proceeding as distinguished from a civil action (Code Civ. Proc., secs. 22, 23; *Estate of Joseph,* 118 Cal. 660 [50 Pac. 768]), and the appellant, being the party prosecuting such proceeding, was the plaintiff, and the widow, as the adverse party, was the defendant therein. (Code Civ. Proc., sec. 1063.) In other words, the position of the widow as a party to the proceeding is that of a defendant defending against the enforcement of an alleged fraudulent agreement, and the position of the appellant is that of a party plaintiff seeking affirmatively to interpose and enforce that agreement against her in extinguishment of a right to administer upon the estate of the deceased, to which, in the absence of such agreement, she would have been entitled. [3] That is to say, the widow, by her answer, is merely seeking defensive relief (*Toby* v. *Oregon etc. R. R. Co.,* 98 Cal. 490 [33 Pac. 550]), and, while it is the rule generally that a cause of action grounded in fraud must be instituted within three years from the time of the discovery of the fraud, that rule does not apply to a defense interposed upon the ground of fraud in a case where it is affirmatively sought to have declared valid and enforceable a contract claimed to have been conceived and consummated in fraud. In such a case, neither the limitation of the statute nor the doctrine of laches will operate to bar

the defense of the invalidity of the agreement upon the ground of fraud, for so long as the plaintiff is permitted to come into court seeking to enforce the agreement, the defendant may allege and prove fraud as a defense. In short, it is not incumbent upon one who has thus been defrauded to go into court and ask relief, but he may abide his time, and when enforcement is sought against him excuse himself from performance by proof of the fraud. (*Cox* v. *Schnerr*, 172 Cal. 371 [156 Pac. 509]; *Hart* v. *Church*, 126 Cal. 471 [77 Am. St. Rep. 195, 58 Pac. 910, 59 Pac. 296]; *Evans* v. *Duke*, 140 Cal. 22 [73 Pac. 732]; *McColgan* v. *Muirland*, 2 Cal. App. 6 [82 Pac. 1113]; *Secret Valley Land Co.* v. *Perry*, 187 Cal. 420 [202 Pac. 449]; *Robinson* v. *Glass*, 94 Ind. 211; *Butler* v. *Carpenter*, 163 Mo. 597 [63 S. W. 823]; *State* v. *Tanner*, 45 Wash. 348, 356 [88 Pac. 321].)

Responding to the issues made by the pleadings, the trial court found substantially in accord with the allegations of the answer to the petition for revocation and the evidence adduced at the hearing, that the deceased died intestate on September 15, 1916, leaving an estate in Los Angeles County consisting of the property described in the petition for revocation; that no application for letters of administration was filed in that court, or any other court, save and except the petition for letters by the widow of the deceased and the application of S. A. Cover for letters contained in the petition for revocation, and that the children of Aaron Cover refrained from making any application for letters of administration upon the estate of the deceased, for the purpose of concealing said estate and depriving the widow of her lawful interest therein. The court further found that on December 24, 1909, the date of the making and execution of the alleged marriage settlement agreement, the deceased was possessed of property valued at two hundred thousand dollars, the greater portion of which, subsequent to the making of the marriage settlement agreement and pursuant to a purpose to defraud his widow, was conveyed by the deceased to his son, U. G. Cover, without consideration; that the widow was an heir of the deceased and as such was entitled to succeed to her share of the real and personal property of the deceased. The latter finding was apparently predicated upon further findings of the trial

court to the effect that the widow did not enter into the marriage settlement agreement in controversy, and this finding was, in turn, rested upon the further finding that said agreement was secured from her as the result of the undue influence and fraud of the deceased and his son, U. G. Cover. The jury, in response to seventeen interrogatories submitted to them, made special findings which were adopted by the trial court, to the effect that the marriage settlement agreement was read to the widow at the time she signed it; that she did not, however, understand its purpose and effect; that she did not at that time know that she was to receive no property from the estate of the deceased, save that described and designated in the marriage settlement agreement, or that she was receiving the same in consideration of waiving all her right in the property and estate of the deceased; that she did not sign the said agreement with the understanding that she was waiving her right to administer the estate of the decedent; that John Stoner, in his dealings with the widow at the time of the execution of said agreement, was acting for the deceased, and that said Stoner at that time falsely and fraudulently represented to the widow that if the deceased died in his then illness she would receive nothing from the estate of the deceased because of the manner in which the son of the deceased, U. G. Cover, was spending the money of the deceased; that the property which the widow received under said marriage settlement agreement was not fair nor adequate to the value of the rights which she thereby surrendered, and, finally, that the widow did not discover until some time in October, 1918, that fraud and undue influence had been practiced upon her in the procurement of the agreement, and that on or about said last-mentioned date she discovered and knew for the first time that she would not receive any of the property of the deceased save that which she had already received under the agreement.

It is contended in support of the appeal that the findings of the trial court and jury to the effect that the deceased obtained the agreement from the widow by undue influence, actual or presumptive, are not supported by the evidence. We will not stop to consider whether or not the evidence adduced upon the whole case supports the findings of undue influence upon the theory that actual undue influence, as

distinguished from presumptive undue influence, was the compelling cause of the wife's assent and signature to the marriage settlement agreement, for we are satisfied that the evidence supports the finding of undue influence, and therefore supports the judgment upon the theory that the agreement in question was procured from the wife as the result of constructive fraud, having its origin in the confidential and fiduciary relation of husband and wife which admittedly existed between the parties to the agreement at the time of its making. [4] Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. The very existence of such a relation precludes the party in whom the trust and confidence is reposed from participating in profit or advantage resulting from the dealings of the parties to the relation. (Civ. Code, secs. 2219, 2228, 2235; *Bacon* v. *Soule,* 19 Cal. App. 428 [126 Pac. 384]; *Robins* v. *Hope,* 57 Cal. 493.)

[5] Confidential relations are presumed to exist between husband and wife, and, in his dealings with his wife, the husband, if he obtains an advantage over her, must stand unimpeached of any abuse of the confidence presumptively reposed in him by the wife and resulting from the marital relation, and, failing in this, he must bear the burden of showing that the transaction was fair and just and fully understood by the party from whom the advantage was obtained. (*Bacon* v. *Soule, supra;* Smith on Fraud, sec. 190; *Robins* v. *Hope, supra; Brison* v. *Brison,* 75 Cal. 525 [7 Am. St. Rep. 189, 17 Pac. 689]; *Jackson* v. *Jackson,* 94 Cal. 446 [29 Pac. 957]; *Dimond* v. *Sanderson,* 103 Cal. 97 [37 Pac. 189].) It is the rule in this state that transactions between husband and wife shall be subjected to the general rule which controls the actions of persons occupying confidential relations with each other, as provided in section 2235 of the Civil Code (Civ. Code, sec. 158), which, when applied to the relation of husband and wife, has been interpreted to mean that "in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the

presumption." (*Odell* v. *Moss*, 130 Cal. 352 [62 Pac. 555]; *White* v. *Warren*, 120 Cal. 322 [49 Pac. 129, 52 Pac. 723]; *Brison* v. *Brison*, 75 Cal. 525 [7 Am. St. Rep. 189, 17 Pac. 689]; 2 Pomeroy's Equity Jurisprudence, secs. 955, 956 et seq.; *Dimond* v. *Sanderson*, 103 Cal. 97 [37 Pac. 189].)

[6] Of course, the mere existence of the marriage relation alone will not, in and of itself, suffice to initiate and support the presumption of undue influence where the transaction between husband and wife is *prima facie*, or, from all of the circumstances thereof, shown to be fair and free from any material advantage to the husband from and over the wife. But in those transactions between husband and wife, where admittedly the husband secures an advantage over the wife, the confidential relation existing between them may be invoked to bring into operation the presumption of the use and abuse of the relation. [7] In short, a husband, by reason of the marital relation, is bound in his dealings with his wife to the highest and best of good faith and as a consequence is obligated in such dealings not to obtain and retain any advantage over her resulting from concealment or adverse pressure, and he must, if he would avoid the presumption of undue influence emanating from the procurement of any advantage over her, make full and fair disclosure to her of all that she should know for her benefit and protection concerning the nature and effect of the transaction, or else he must deal with her at arm's length and as he would with a stranger, all the while giving her the opportunity of independent advice as to her rights in the premises. (*Yordi* v. *Yordi*, 6 Cal. App. 20 [91 Pac. 348]; *Piercy* v. *Piercy*, 18 Cal. App. 751 [124 Pac. 561]; *Nobles* v. *Hutton*, 7 Cal. App. 14 [93 Pac. 289]; *Payne* v. *Payne*, 12 Cal. App. 251 [107 Pac. 148]; *Ross* v. *Conway*, 92 Cal. 632 [28 Pac. 785]; *Dolliver* v. *Dolliver*, 94 Cal. 642 [30 Pac. 4].)

The evidence bearing upon the issue of undue influence shows, in part, that at the time of the making of the agreement the deceased and his wife had been married for twenty-one years, and that as the issue of this marriage one child had been born to them. The deceased, at the time of the marriage, was sixty-two years of age and the wife was thirty-two years of age. It was an admitted fact in

the case that the deceased and his wife, during all of their married life, lived in harmony and that the marriage relation was ideal, and that she was in every respect a loyal, dutiful, and helpful wife. We do not deem it essential to a decision of the case to further recite in detail the evidence bearing upon the issue of undue influence. [8] Suffice it is, we think, for us to say that the finding that the agreement was conceived and consummated in presumptive undue influence is sufficiently sustained, when measured by the equitable principles which governed and controlled the dealings of the parties and by a consideration of the evidence— standing in the record practically uncontradicted—of the circumstances preceding and immediately attending the execution of the agreement, showing in substance, as it does, that the widow executed the same in ignorance of her rights and without independent advice as to its meaning and effect; that she thereby released her expectancy to a substantial portion of a two hundred thousand dollar estate in return for a consideration obviously inadequate; and that the agreement was drafted at the direction of the deceased and executed by the widow at his instigation ''in respect for the wishes'' of the deceased, without any disclosure by him to her of the then value and character of his estate or of the rights which she was called upon to surrender by the agreement. (*Hessick* v. *Hessick,* 169 Ill. 486 [48 N. E. 712]; *Graham* v. *Graham,* 143 N. Y. 573 [38 N. E. 722]; *In re Haberman's Estate,* 239 Pa. St. 10 [86 Atl. 641]; *Egger* v. *Egger,* 225 Mo. 116 [135 Am. St. Rep. 566, 123 S. W. 928]; *Simpson* v. *Simpson's Exrs.,* 94 Ky. 586 [23 S. W. 361].)

[9] The fact that the widow may have known at the time of the execution of the agreement that the deceased had the reputation of being a very wealthy man did not, in and of itself, suffice, as appellant contends, to impute knowledge to her of the value and character of his estate at that time. The business of the deceased, scattered as it was over a wide range of territory and consisting as it did of moneylending and the taking and buying of notes and mortgages, was largely invisible. Under such circumstances, the mere reputation of his wealth was a thing too indefinite and intangible to be made the basis of knowledge or the means of knowledge on the part of the widow as to the character

188 Cal.—10

and value of the property of the deceased (*Hessick* v. *Hessick*, 169 Ill. 486 [48 N. E. 712]), and therefore "when dealing with his inexperienced and confiding wife it was his duty not only to have explained to her what rights she was surrendering, but to develop to her approximately, at least, the value of his estate." (*Simpson* v. *Simpson's Exrs.*, *supra*.)

[10] It is argued on behalf of the appellant, in effect, that even though the doctrine of laches may not be formally pleaded in avoidance of the defense of fraud, nevertheless, the widow, having accepted and retained, without protest or repudiation, the benefits of the agreement during a period of several years after its making, is estopped from defending against its operation. There might perhaps be much force in this contention if it had been shown in evidence that the widow had discovered, at any time subsequent to the making of the agreement and prior to the death of the deceased, the fraud alleged to have been practiced upon her by the deceased. But the pleadings, the evidence, and the supported findings show, in substance, that the widow was ignorant of the scope and effect of the agreement, not only at the time of its making, but at all times thereafter until shortly before she petitioned for letters of administration, and that not until then did she have occasion to doubt the *bona fides* of the deceased. Accepting the agreement in the belief that the deceased was dealing honestly with her, she was justified in resting in that belief, and was not called upon then or thereafter to make independent inquiry as to his good faith. (*Shiels* v. *Nathan*, 12 Cal. App. 604 [108 Pac. 34].) Accepting and retaining the benefit of the agreement, as the evidence shows she did, in continuing ignorance of the effect thereof upon her right to succeed to a portion of the estate of the deceased in the event of his dying intestate, did not operate as an estoppel, for to constitute an estoppel it must be made to appear that she acted with full knowledge of all the material facts and circumstances and with full knowledge of her rights in the premises. (*Burke* v. *Adams*, 80 Mo. 505, 514 [50 Am. Rep. 510]; *Garesche* v. *Levering Inv. Co.*, 146 Mo. 436, 451 [46 L. R. A. 232, 48 S. W. 653]; *Egger* v. *Egger*, 225 Mo. 116 [135 Am. St. Rep. 566, 123 S. W. 928]; *Wheaton* v. *North Brit-*

*ish etc. Ins. Co.,* 76 Cal. 415 [9 Am. St. Rep. 216, 18 Pac. 758] ; *Puterbaugh* v. *Wadham,* 162 Cal. 611 [123 Pac. 804].)

[11] The point is made that the evidence adduced upon the hearing of the contest shows that the deceased died without leaving any estate in California or elsewhere, and that, as a consequence, the widow was not entitled to letters of administration in the first instance. This point is made and based upon the fact that there is some evidence in the record, which came in incidentally, tending to show that the only piece of property standing of record in Los Angeles County in the name of the deceased was that covered by a sheriff's deed to the deceased following a mortgage foreclosure sale, which deed was recorded after the death of the deceased, and from this it is argued, as we understand the contention of appellant, that, inasmuch as the uncontradicted evidence shows elsewhere that the deceased had previously conveyed by grant, bargain, and sale deed all of the property which he possessed in California and elsewhere, the after-acquired title, if any, to the property described in the sheriff's deed vested in the grantee of the deceased named in the prior deed. Granting the latter proposition to be correct, still we are confronted with the fact that by the pleadings of the parties it was an admitted fact in the case that the deceased died leaving in California an estate consisting of the real property described in the petition for revocation. This being so, the admitted fact must control as against the evidence referred to, in support of the finding that the deceased left an estate in Los Angeles County, for it is the rule that an admitted fact must be treated as "found," and if the court in this case had found adversely to the admitted fact that the deceased left estate in Los Angeles County, we would be compelled to ignore such finding on this appeal. (*In re Doyle,* 73 Cal. 564 [15 Pac. 125] ; *Ortega* v. *Cordero,* 88 Cal. 221 [26 Pac. 80] ; *Nuttall* v. *Lovejoy,* 90 Cal. 163 [27 Pac. 69].)

Moreover, we have not before us the record of the jurisdictional facts requisite to the granting in the first instance of the letters of administration to the widow, and the absence of such a record, coupled with the fact that the issuance of such letters is not assailed by the petition for revocation upon the ground that the deceased died without leaving any estate, warrants the presumption, which must

stand in the absence of proof responding to a pleading to the contrary, that the order granting letters of administration was made upon a proper and sufficient showing that the deceased died leaving an estate in California.

[12] The court below found that all of the property possessed by the deceased, at the time of the making of the agreement and at the time of his death was separate property. This finding is supported by the evidence. His estate being separate property, the widow would have been entitled to succeed to a portion thereof only in the event of the deceased dying intestate. Therefore, it may be conceded that the deceased, without regard to the marriage settlement agreement, might have conveyed or willed away his entire estate had he been so disposed, to the entire exclusion of the widow, without legal let or hindrance from her. From this it is argued, as we understand the contention of appellant, that, having deeded practically his entire estate to his son immediately following the making of the agreement in controversy, the situation at the time of the death of the deceased was, in effect, the same as if he had willed his estate to others than the widow, and not being entitled in either event to any portion of the estate of the deceased, the widow has no just ground for complaint against the making of the agreement. The answer to this contention is to be found in the fact that the deceased died leaving an estate undisposed of by will, and thus, but for the interposition of the agreement in controversy, the widow would be entitled to succeed to a portion thereof coupled with the concurrent preferential right to administer his estate.

[13] Conceding, as is contended, that the offer by the widow to restore to the estate of the deceased the property which she received in consideration of making the agreement was indispensable to her right to defend against the obligation of the agreement, still, as we read and understand her answer, that is just what she offered to do. Her answer alleges that she "offers to account to the legal representatives of the estate . . . for each and singular all the property received by her pursuant to the terms of said contract, and to do equity." This offer could be made to no one else but the representative of the estate, and the fact that the widow herself happened to be such representative did not militate against its efficacy. The offer in its entirety

and in the particular to do equity was, in effect, an offer to credit the estate with the property received under the agreement and subject it to administration, and so construed was a sufficient offer to restore. The allegation in the defendant's answer in this behalf, in conjunction with the evidence adduced upon the hearing of this phase of the case, was sufficient to support the finding that the widow did "tender back the consideration which she received under the property settlement agreement." (*Wilks* v. *Wilks,* 176 Ala. 151 [57 South. 776]; *Gidney* v. *Chappell,* 26 Okl. 737 [110 Pac. 1099]; *Hurst* v. *Knight* (Tex. Civ.), 164 S. W. 1072; *Cecil* v. *Henry* (Tex. Civ.), 93 S. W. 216; *Pinkston* v. *Boykin,* 130 Ala. 483 [30 South. 398].)

Complaint is made of certain instructions given in the charge of the court to the jury, and also of the refusal to give certain instructions requested by the appellant. In view of what we have previously said with reference to the law and the facts of the case, we are satisfied that the charge of the court as a whole was correct and that the instructions requested by appellant were in each instance properly refused and modified by the court.

Finally, it is contended that appellant's motion for a new trial should have been granted upon the showing of newly discovered evidence made in support of the motion.

[14] Ordinarily, newly discovered evidence is looked upon with disfavor, and a party relying thereon must make a strong showing of diligence on his part in preparing for trial. (*Harralson* v. *Barrett,* 99 Cal. 607 [34 Pac. 342]; *Tibbet* v. *Sue,* 125 Cal. 544 [58 Pac. 160]; *Arnold* v. *Skaggs,* 35 Cal. 684.) And, granting the importance of the alleged newly discovered evidence, the motion, upon the ground stated, was properly denied, because a sufficient showing was not made in the affidavits offered and received in support of the motion that reasonable diligence was exercised, prior to the hearing of the petition, for the procurement of the alleged newly discovered evidence. It was the duty of appellant and his counsel, in the preparation of the case, to make every reasonable search for and inquiry of witnesses who might be reasonably expected to give testimony concerning the facts in issue. (*Butler* v. *Estrella etc. Co.,* 124 Cal. 239 [56 Pac. 1040]; *Koskela* v. *Albion Lbr. Co.,* 25 Cal. App. 12 [142 Pac. 851]; 20 Standard Ency.

of Proc., p. 570.) It appears from the affidavits of the witnesses who were alleged to have been newly discovered that they were known to be either related to or social friends of the widow with whom they came in frequent and intimate contact prior to the hearing; and while it is alleged generally in the affidavits that these witnesses could not have been discovered by reasonable diligence prior to the hearing, nevertheless it was not made to appear in the affidavit of appellant that he did not know of the existence of the witnesses and their association with the widow, or that he or anyone in his behalf made any inquiry at all among the friends, relatives, and associates of the widow to ascertain what, if anything, such persons knew in relation to the matters in issue. This being so, it cannot be said that the affidavits make a showing of sufficient diligence in the preparation of the case, and therefore do not make a sufficient showing of the requisite diligence to warrant a granting of the motion for a new trial upon the ground of newly discovered evidence. (*Du Souchet* v. *Dutcher,* 113 Ind. 249 [15 N. E. 459].)

The judgment is affirmed.

Wilbur, J., Shaw, C. J., Lawlor, J., Waste, J., Shurtleff, J., and Sloane, J., concurred.

Rehearing denied.

All the Justices concurred.