[Civ. No. 21912. Second Dist., Div. Two. Apr. 3, 1957.]

LEONA B. WILSON et al., Respondents, v. LESLIE
CHARLES FOLEY III et al., Appellants.

Eugene S. Ives for Appellants.

Desser & Hoffman, David M. Hoffman and Tom C. Williams for Respondents.

MOORE, P. J.—Defendants appeal from a judgment, after verdict, in an action arising from the collision of a fast-moving tractor hauling two semi-trailers, and a stationary automobile.

The appeal is grounded upon the claims that:

(a) No substantial evidence that negligence on the part of defendant Foley contributed to the happening of the accident;

(b) Error in instructing the jury that it was a question of fact as to whether or not the paved shoulder was a part of the main traveled portion of the highway;

(c) Error in refusing to admit certain expert testimony as to the speed of the tractor and trailers at the time of impact;

(d) Error in failing to instruct that looking and not seeing, or failure to look, is negligence;

(e) Plaintiffs' decedent truck driver was guilty of contributory negligence as a matter of law.

### SUFFICIENT EVIDENCE

The accident occurred seven and one-fourth miles north of Santa Barbara on Highway 101. It was an early morning in April; the weather was foggy; normal visibility was materially reduced. One McLeod who had been driving his sedan southward took aboard a hitch-hiking sailor; thereafter he ran out of gas and stopped. At the point where McLeod stopped, the highway consisted of two lanes 11 feet wide on each side of the white center line, and 8-foot paved shoulders extending out from each side thereof. The paved

shoulder was of a composition and texture different from that of the main traveled portion[1] of the highway. Having parked his car parallel to the highway, but half on the paved shoulder and half on the dirt shoulder, he left both headlights and tail lights burning and joined the sailor in flagging down traffic for the purpose of obtaining gasoline.

Soon thereafter, Foley, accompanied by one Sheridan, arrived from the north in a foreign-built vehicle and came to a stop at a point from 20 to 40 feet ahead of McLeod's sedan. The exact location of the foreign vehicle on the highway after it had come to a standing position was the subject of conflicting testimony. Mr. Foley having suffered retrograde amnesia in the subsequent collision was unable to testify. The only other surviving eyewitnesses were Sheridan and McLeod. They testified that the Foley car was parked about two car-lengths ahead of the McLeod car and at a slight angle headed to the right, or west, with the right front wheel and about half of the right side off the paved shoulder and on the dirt, while the left rear wheel stood about 4 feet east of the outside edge of the paved shoulder. After Foley parked, he was accosted by the sailor who asked for a ride to get gasoline. On receiving an affirmative reply, the sailor entered the Foley vehicle. McLeod returned to his car, reduced the headlights to parking lights, turned on the interior lights and left the tail lights burning. Just as McLeod entered the Foley machine, its rear end was struck by a tractor pulling two loaded semi-trailers, property of Rainville Trucking Company, driven by Earl Wilson, husband and father of respondents. The sailor was killed and Wilson died from his resulting injuries.

The witness Haven, also driving a truck south, arrived while the dust of the Wilson crash was still in the air. He testified that McLeod told him the Foley vehicle was "setting in the highway" and pointed to the middle of it. Also, Haven observed gouge marks in the main traveled portion where McLeod pointed. There was expert testimony that these gouge marks were made by certain portions of the rear of Foley's machine, and photographs showed that its rear end was demolished. It was pushed forward and turned around clockwise, coming to rest off the right paved shoulder 77 feet and 7 inches distant from the first gouge mark on the pavement. The truck proceeded south and ran into a culvert abutment west of the highway and came to rest with the

---

[1] By "main traveled portion" we refer to the 11-foot southbound lane.

tractor and one trailer in the ditch. The second trailer was stopped south of the culvert, coming to rest on its side and headed north. The distance from the first gouge mark to the abutment was 158 feet, 8 inches. Haven testified that when he arrived, the Foley vehicle was approximately 70 feet south and west of the right front of McLeod's car on the dirt shoulder.

There is a conflict of evidence with respect to the point of impact. This conflict arises not only from the physical evidence of the gouge and tire marks on the pavement as against the testimony of the only two eyewitnesses, but also from the conflicting expert testimony with respect to the meaning of the physical evidence. It is established that there were *two sets of tire marks* starting with the gouges. One set turned right toward the spot where the foreign vehicle rested, and the other set led to the culvert and the truck. There were no gouges on the paved shoulder and there were no tire marks north of the gouges on either the paved shoulder or the main traveled portion. There was opinion testimony that the point of impact was 5 or 10 feet north of the most northerly gouge mark. The gouge marks were just a little south of McLeod's car, according to Haven. When Haven arrived, he found a crumpled piece of chrome lying by one of the gouge marks and threw it off the road. Also, he saw dirt lying "just behind the skid marks to just past the gouges." It was dirt "like you would get off underneath your car if you bump it or something, it falls on the pavement." Photographs of the foreign vehicle show that its rear end took the full force of the blow almost direct. Mr. Harper, an expert witness for respondents, testified that, based on measurements of the gouges and the rear understructures of the foreign vehicle, it was his opinion that certain of the gouges had been made by its rear spring hangers.

In view of the foregoing evidence and drawing all reasonably favorable inferences from it, we conclude that there was substantial evidence upon which the jury found Foley guilty of negligence proximately causing the accident. In fact, without any expert testimony, but merely from a study of the photographs of the gouges, tire marks and resting places of the vehicles, the jury reasonably inferred that at the time of impact some portion of the rear of the foreign vehicle was protruding or resting upon part of the main trav-

eled portion of the highway in violation of section 582[2] of the Vehicle Code.

But appellants argue that the physical evidence is rebutted by the eyewitness testimony of McLeod and Sheridan and by the opinion of their expert witness, Lynch, who opined that the gouge marks were made by the truck. At the most, this merely creates a conflict in the evidence which the jury resolved against appellants and is binding on appeal. The jury may have disbelieved Sheridan and McLeod by reason of bias and interest. Sheridan was a longtime friend of Foley and an occupant of his vehicle, and he testified that it was parked about 60 feet ahead of McLeod's car, part on the paved shoulder and part on the dirt, at an angle headed more nearly to the south. On cross-examination he said he did not remember having told Officer Ferrari that the Foley vehicle stopped about 15 or 20 feet ahead of McLeod's car or that he had stated to the officer that Foley pulled toward the shoulder, and that "we were partially in the highway." It was stipulated that if Ferrari were recalled he would testify to the foregoing statements made to him by Sheridan shortly after the accident. Sheridan was a vague, unreliable and interested witness. McLeod was plaintiff in an action for damages against the Rainville Trucking Company and the California Freight Lines which was tried contemporaneously with this case. Appellants admit that McLeod was impeached by Haven with respect to the position of the Foley car, but argue that Haven's impeaching testimony does not constitute positive evidence of the fact, citing *Albert* v. *McKay & Co.*, 174 Cal. 451, 456 [163 P. 666]. ■ Considered only as impeaching testimony this is true, but as stated in the Albert case, when a witness is impeached by proof of prior inconsistent statements, the effect is to discredit him as a witness. ■ The jury was properly instructed that the presumption

[2]Vehicle Code, § 582. "Upon any highway in unincorporated areas no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the main traveled portion of the highway when it is practicable to stop, park or so leave such vehicle off such part or portion of said highway but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle shall be available from a distance of 200 feet in each direction upon such highway. This section shall not apply upon a highway where the roadway is bounded by adjacent curbs.

"This section shall not apply to the driver of any vehicle which is disabled in such a manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle on the main traveled portion of a highway."

that a witness speaks the truth may be overcome "by evidence that on some former occasion he made a statement or statements inconsistent with his present testimony" and that "a witness false in one part of his . . . testimony is to be distrusted in others." Under these instructions the jury was entitled to disbelieve McLeod and we must presume that they did. In addition, McLeod himself testified that he had no recollection of how he got gasoline to move his car and continue his trip to Jacumba or of when he left Jacumba for his return trip to San Francisco. He had no recollection of his travel south to Jacumba, although the evidence shows he left the scene of the accident within a short time and before Officer Ferrari had an opportunity to question him. On his way back north the next day he drove about two miles past the scene of the accident when he was stopped by Ferrari who suspected that it was the same sedan which had been described to him as having been at the scene of the accident. McLeod still had the sailor's bag in his car with all the deceased sailor's identification. When Ferrari stopped him, McLeod was dazed and shocked. From McLeod's own testimony, the jury reasonably could have inferred that the shock of the accident had left him with an impaired recollection of what occurred immediately before it, and they were justified in relying upon the physical facts as against the conflicting oral testimony of Sheridan and McLeod.

█ It is a vain pursuit to attempt to upset a judgment on the ground of insufficiency of the evidence where there is a substantial conflict. (*Kaichen* v. *Showers,* 146 Cal.App. 2d 804, 805-806 [304 P.2d 137].) The same rule applies to expert testimony. (*Khan* v. *Southern Pac. Co.,* 132 Cal.App. 2d 410, 415 [282 P.2d 78]; *Sim* v. *Weeks,* 7 Cal.App.2d 28, 39 [45 P.2d 350].) Also, the same rule applies to conflicting reasonable inferences. █ If the inferences drawn from the proof are reasonable, the reviewing court has no power to substitute its deductions for those of the jury. (*Callahan* v. *Gray,* 44 Cal.2d 107, 111 [279 P.2d 963]; *Risley* v. *Lenwell,* 129 Cal.App.2d 608, 625 [277 P.2d 897]; *Hamilton* v. *Pacific Electric Ry. Co.,* 12 Cal.2d 598, 602 [86 P.2d 829].)

A close inspection of the photographs of the highway and the testimony with reference thereto removes all doubt as to the wisdom of the jury. It is disclosed that there were six gouge marks in the main traveled portion of the paved area at the scene of the collision. They were not there prior to

the accident. They varied in length from 4 inches to 56 inches. The one nearest the center line was 90 inches west of the center line and the farthest was 123 inches west. This places all of them within the 11-foot main traveled southbound lane.

Viewed in the light of the cited authorities, there is ample evidence to sustain the jury's implied finding of negligence on the part of Foley.

### INSTRUCTIONS

 At the request of Foley, the court instructed on the provisions of section 81 of the Vehicle Code.[3] Immediately following, the court on its own motion added the following: "Under this definition the paved shoulders of the road are included as a portion of the highway. Whether or not such shoulders are part of the main-traveled portion of the highway in any case is a question of fact to be decided in accordance with the evidence related thereto."

Appellants contend that the addition of the above-quoted portion constituted prejudicial error. They point out that prior to 1948, section 582 of the Vehicle Code prohibited parking "upon the paved or improved or main traveled portion of the highway." They urge that deletion of the words "paved or improved" left only the main traveled portion of the highway to which the section would apply. Appellants say that under the wording of section 582, the paved shoulders were not part of the main traveled portion of the highway and therefore parking of the Foley car on the paved shoulder "could not be negligence as a question of law or fact." We may agree that the amendment of section 582 removed the former illegality of parking on a paved shoulder, but appellants go further and say therefore that so to park is *not* negligence as a matter of law or fact. This is a non sequitur. There are innumerable decisions in which lawful acts have been performed in such a negligent manner as to create liability. The time, place and circumstances are largely controlling. On a clear day, parking on an 8-foot paved shoulder may be the very essence of due care and prudence. But in the case at bar, the jury could very well have concluded that so to park on a dark, foggy night when there was ample room off the paved shoulder was not only negligent but foolhardy. The widening of an old highway

---

[3] Vehicle Code, § 81. " 'Street' or 'highway' is a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel."

by adding 8-foot paved shoulders constitutes an invitation to motorists to use them for travel as well as parking. Certainly, it cannot be said, as a matter of fact, that it is *not* negligent to park on a paved shoulder under any and all circumstances, and the Legislature evidently held the same opinion when it removed the former illegality. Appellants' argument that because the Foley automobile was parked on the paved shoulder (if it was), there was no actionable negligence, is erroneous. Under the weather conditions and other circumstances, the jury reasonably could have found negligence in the manner in which Foley parked his foreign vehicle.

On the whole, the evidence was sufficient to warrant a finding that the paved shoulder was a part of the main traveled portion of the highway in this instance. It follows that there was no error in the instruction now under consideration. But, if it were held erroneous, it could not be said, to have worked prejudicial error for it appears that respondents should have prevailed. (Cal. Const., art. VI, § 4½.) There was ample evidence upon which the jury could have found negligence without finding also that the paved shoulder was part of the main traveled portion of the highway. Since it cannot be said that the verdict probably would have been different had the instruction not been given, there is no prejudicial error.

Appellants requested the giving of B.A.J.I. Number 140 to the effect that looking and not seeing, or failure to look, was negligence. It was refused and appellants claim error. Their argument is that since the jury was instructed that Wilson was entitled to the presumption of due care, and since the foreign car was clearly visible from a distance of from 150 to 200 feet and Wilson made no attempt to stop the tractor or go around the car, the jury should have been instructed that failure to see that which is in plain sight means that the person is negligently inattentive. While ordinarily B.A.J.I. Number 140 should be given in a case such as this, where the jury has been told that respondents were entitled to the presumption of due care on the part of decedent, it cannot be said that in the instant case failure to read it constituted prejudicial error. There was much conflict in the evidence regarding the range of visibility. Even though Wilson might have *seen* Foley's tail lights in time to stop or pass around them, he might not have realized the vehicle was standing still until he was practically upon it.

"It is not an easy matter to determine at night whether a vehicle seen ahead on the highway is standing still or moving, even though it be well lighted. It cannot be said as a matter of law that there is some *definite distance* from a parked vehicle at which an approaching driver must realize that the vehicle is standing still, in order to be free from negligence . . . It must be remembered that automobile drivers have the right to anticipate that standing vehicles ahead of them will be parked off the highway, if it is practicable to so park them, and the right to act upon that assumption until there are reasonable grounds for believing that there is some vehicle ahead that is not so parked." (*Doane* v. *Smith*, 63 Cal.App.2d 691, 696-697 [147 P.2d 650].)

In the instant case, Wilson was driving the road practically every night and it could be inferred he knew, not only of the 8-foot paved shoulder, but also of the wide dirt shoulder adjoining it. He had a right to rely upon the presumption that lights ahead of him, if they were on the main traveled portion of the highway, were moving and not standing still. The effect of the fog was to diffuse the glare of Foley's tail lights, which in turn rendered it difficult to judge the distance. While failure to give the requested instruction may have been error, it was not prejudicial to appellants in view of all the evidence.

ADMISSIBILITY OF EXPERT'S OPINION OF TRUCK'S SPEED

Appellants claim prejudicial error in the exclusion of the testimony of their expert, Frank C. Lynch. If allowed to, he would have testified that in his opinion Wilson's truck was traveling at a minimum of 60 miles per hour at the moment of impact. The receipt or refusal of expert testimony is largely within the discretion of the trial court and will not be disturbed on appeal in the absence of a clear showing of abuse. (*Huffman* v. *Lindquist*, 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; *People* v. *Haeussler*, 41 Cal.2d 252, 261 [260 P.2d 8].) Without discussing in detail all the factors Mr. Lynch considered in arriving at his opinion, it is sufficient to state that many of them were purely speculative and without foundation in the evidence. All the evidence of the collision and the course and behavior of the vehicles was found after the point of impact, that is, after the start of the first gouge mark. There was no evidence that the brakes had been applied before the impact. In fact, it was pure speculation as to whether they had been applied

by Wilson, or by the breaking of the air line through the force of the impact. As the trial court aptly stated in refusing to admit the opinion: ''I have tried many cases in which there was expert testimony of speed and in none of them have I ever seen an expert's opinion based on so many speculative factors as in this one.'' We find no prejudicial error in the exclusion of Lynch's estimate of 60 miles per hour, particularly in view of the fact that there was some evidence that Wilson's truck would not go over 52 miles per hour.

## CONTRIBUTORY NEGLIGENCE

Appellants finally complain that Wilson was guilty of contributory negligence as a matter of law and base their contention primarily upon evidence that there was ''unobstructed visibility ahead on the highway for lights of as a minimum 150-200 feet.'' But there was conflict in the evidence even as to this point. Ferrari testified that visibility existed for 150 to 200 feet ''on approaching oncoming vehicles with headlights on'' and that ''tail lights were somewhat impaired due to spot fog patches.'' Haven testified that he did not see any lights on the back of McLeod's car until he got ''right up close'' and that at 200 feet he saw only the glare or reflection in the air of the fire in the burning Foley vehicle. It was this glare which first attracted Haven's attention and caused him to slow down preparatory to stopping. One Romero testified that as he approached the scene of the accident, he could see ahead only 25 feet and that fog banks were coming in at the scene. The jury was correctly instructed on the matter of contributory negligence at the request of appellants and it was a question of fact for the jury to determine whether, under the existing circumstances, Wilson should have seen the Foley vehicle in time to stop or swerve around it. The cases in which it can be said as a matter of law that the negligence of a plaintiff's decedent contributed proximately to the accident are rare, and before it can be held as a matter of law that such negligence exists, the evidence must point unerringly to that conclusion. (*Anthony* v. *Hobbie*, 25 Cal.2d 814, 818 [155 P.2d 826]; *Gottloeb* v. *Melrose Health Baths*, 148 Cal.App. 2d 313, 318 [306 P.2d 568].) In the instant case plaintiffs were entitled to, and received, the instruction that the deceased Wilson was presumed to have exercised due care and ordinary prudence. This presumption coupled with the conflict in the evidence as to the visibility, is sufficient to

raise a question of fact for the jury on the subject of contributory negligence.

All the questions presented on this appeal were raised in the trial court on a motion for a new trial. The court had heard the witnesses and seen the visual evidence, such as photographs and diagrams. In denying the motion, the trial court impliedly found that the jury had correctly determined the issues of fact and that no error had been committed.

Judgment affirmed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied April 26, 1957.