[Civ. No. 24829. Second Dist., Div. One. Aug. 17, 1961.]

ENRIQUETA FERNANDEZ, Appellant, v. FELIPE FERNANDEZ, Respondent.

William Barnett Spivak and Meyer M. Willner for Appellant.

Cooper & Nelson, Gerald R. Knudson and Richard M. Moore for Respondent.

LILLIE, J.—At the trial of the within divorce action, the court below first heard and decided the property issue; ruling in favor of the validity of an antenuptial agreement and declaring no community property to exist, it then heard the remaining matter as a default and granted plaintiff wife an interlocutory decree of divorce. Among other things, the judgment directed the payment of $1,500 monthly alimony, certain incidental expenses, custody of and support for a minor son and an emancipated daughter, $4,000 additional attorney's fees, and $1,463 costs; it awarded certain property to defendant husband as his sole and separate property. From the judgment plaintiff appeals. Predicated on the alleged invalidity of the antenuptial agreement, plaintiff argues error in the finding that there is no community property; and asserts the inadequacy of the awards for alimony and additional attorney's fees. Basically these points are directed to the sufficiency of the evidence.

The parties were married in Mexico City in 1939; they have since resided in Los Angeles. The facts surrounding the execution of the antenuptial agreement, an integrated part of the marriage ceremony in Mexico, are in considerable dispute; but the parties agree that where the law of Mexico in 1939 is applicable and it is necessary to take judicial notice (Code Civ. Proc., § 1875) thereof, the court may refer to the

Civil Code for the Federal District and Territories of Mexico, as translated by Schoenrich (Baker, Voorhis and Co., Inc; N.Y. [1950]). In determining the validity of the agreement the court below applied the law of Mexico as found in the Civil Code (Findings of Fact, pars. XXVIII, XXIX); no issue concerning application of the Mexican law is raised in appellant's opening brief, in fact appellant relies on the law of Mexico in her main contention that the agreement is invalid in that it was not executed in accord with the provisions of Mexican law. Further, the parties expressly provide in the agreement that the pertinent articles of the Civil Code of Mexico shall govern "[i]n any situation unforeseen in this agreement." (Exhibit F, par. VII) (*Fageol Truck & Coach Co.* v. *Pacific Indemnity Co.*, 18 Cal.2d 731 [117 P.2d 661].)

Under Mexican law, marriage is a civil contract within the exclusive jurisdiction of the civil authorities (Constitution of Mexico, art. 130), in the instant case, the Office of the Civil Registry in Mexico City (Civil Code, art. 35, p. 10). Persons intending to marry are required to appear before a clerk of the Office of the Civil Registry and make a written application for marriage (Civil Code, art. 97, p. 25), at which time they must give the clerk all statistical data, file the necessary certificates and select a date for the ceremony. If one of the parties is a minor, a parent or legal guardian must be present, sign and approve the marriage application (Civil Code, art. 100, p. 27). There are two systems under which parties may marry (Civil Code, art. 178, p. 45)—the separation of properties regime, and the conjugal society regime (Civil Code, art. 179, p. 45). Under the separation of properties each spouse preserves the full ownership and administration, not only of the properties already acquired prior to the marriage, but of after-acquired property as well, including the product of his or her skill and labor (Civil Code, arts. 207, 213; pp. 50, 51, 52); under conjugal society the parties pool their resources, and ownership of all property is vested in both (Civil Code, art. 194, p. 48). At the time the parties make application for marriage they must elect under which regime they wish to marry and so advise the clerk; under either regime the parties must, before the marriage and in accord with their election, enter into an agreement with respect to their property rights presently existing and to after-acquired property (Civil Code, art. 98, par. V, p. 26). When application for marriage is made, either the clerk of the Office of the Civil Registry inquires of them under which system they

intend to marry, or the parties announce their intention to the clerk and request the requisite blank forms on which their property is to be listed. It is the obligation of the clerk at that time to "give special attention to this point, explaining to the interested parties all they need to know, so that the agreement may be duly formulated" (Civ. Code, art. 98, par. V, p. 27). The forms given to the parties may be completed there or taken with them; the actual agreement is prepared in accordance with their election and the information contained in the completed forms by either the parties themselves or the Office of the Civil Registry. On the day chosen for the marriage, the parties present to the Judge of the Civil Registry, who performs the ceremony, all marriage papers including the property agreement. The parties must then read and sign the latter in the presence of those assembled; if either is a minor his parent or guardian must sign the same indicating the necessary consent (Civil Code, art. 98, par. V, p. 26); and the signatures must be acknowledged by the judge (Civil Code, art. 105, p. 29). He then performs the ceremony, during which the marriage documents, including the property agreement, are read aloud (Civil Code, art. 102, p. 28). The entire proceeding is made a matter of record in the marriage certificate (*Acta de Matrimonio*), (Civil Code, art. 103, pp. 28, 29), the original of which is filed in the Office of the Civil Registry.

In arguing that the trial court erred in finding that there is no community property, appellant asserts that the antenuptial agreement wherein the parties submitted themselves to the regime of separation of properties, was not read and explained as required by Mexican law; that because of the difference in age and experience of the parties defendant owed a fiduciary duty to her, which he violated; that she did not knowingly consent to a marriage under the separate properties regime and was unaware of the consequences of such an agreement; that the agreement was not executed according to Mexican law; and that the finding is against the great weight of the evidence (A.O.B., pp. 7-8).

Inasmuch as the issues arising out of this contention are mainly factual, almost every material part of the testimony is in dispute, and plaintiff relies only on the evidence favorable to her, we point up the fundamental rule that this court has "no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom"

(*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757]), nor may it substitute its deductions for those of the trial court (*Grainger* v. *Antoyan,* 48 Cal.2d 805 [313 P.2d 848]). ▮ Thus, the presumption being in favor of the judgment we view the evidence in the light most favorable to the defendant giving him the benefit of every reasonable inference and resolving all conflicts in favor of the judgment. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427 [45 P.2d 183]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].) Over 1100 pages of testimony produced 11 witnesses and numerous exhibits, all of which resulted in considerable conflict. The trial judge heard and observed the witnesses; and that the circumstances occurred over 20 years ago in a foreign country, interpreters were needed by some witnesses and others were unavailable or testified by way of deposition, the claim involved extensive property and was vigorously tried, and some of the witnesses showed more than the ordinary bias, were all factors for the judge's consideration in determining that which was worthy of belief. ▮ Further, when a finding is attacked for insufficiency of the evidence, ''the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence *contradicted* or *uncontradicted* which will support the finding of fact. [Citations.]''[*] (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231].) (Emphasis added.)

Applying the foregoing we deem the findings that ''there is no community property'' (par. IV); ''no confidential relationship existed in fact or in law between plaintiff and defendant, nor was defendant guilty of any fraud, deceit, imposition or overreaching'' (par. XIV); and that ''each, every and all of the necessary and requisite steps leading up to the preparation and execution of the antenuptial agreement . . . were performed in full compliance with the Constitution and laws of Mexico'' (par. XIII), to be adequately and fully supported by the evidence.

Plaintiff, 19 years old and a national and resident of Mexico, and defendant, 45, a Peruvian national residing in Los Angeles, became engaged in December 1938. Plaintiff lived with her mother, her only living parent and guardian, in Cuernavaca, Mexico. On January 16, 1939, in the company of plaintiff's mother, the parties appeared in the Office of the Civil Registry in Mexico City and signed the written application for marriage (Exhibit A)—it was also signed and approved by plaintiff's mother as plaintiff's parent and guard-

ian. At this time the parties were asked by the clerk whether they intended to be married under the regime of separate properties or conjugal society; defendant did not know of these two systems and questioned the clerk as to the difference, which she explained; then plaintiff, defendant and plaintiff's mother there discussed the matter and they decided that the marriage be solemnized under the regime of separate properties and so notified the clerk, who requested them to deliver to the Office of the Civil Registry a list of all the property they owned; the clerk further informed them that the Office of Civil Registry would prepare the antenuptial agreement according to their wishes. The parties took the blank forms; thereafter, defendant again on several occasions discussed his property and assets with plaintiff and her mother, both separately and together, in the latter's home in Cuernavaca; he listed his property, its value and his debts, and on January 20, delivered the list together with a statement that plaintiff owned nothing, to the Office of the Civil Registry. On the morning of January 23, the parties went through a religious ceremony before a Catholic priest at the Cathedral in Cuernavaca; immediately thereafter and on the same day around noon, they and plaintiff's mother presented themselves at the Office of the Civil Registry in Mexico City for the civil ceremony. Before it was performed, the antenuptial agreement (Exhibit F; translation, Exhibit A attached to Findings of Fact) which had been prepared and typewritten by the Office of the Civil Registry, in accord with their election and oral agreement and from the information supplied by the parties in the completed forms, was handed to the parties and read and signed by them before those assembled, and read and signed by plaintiff's mother; and the agreement and other marriage documents were thereafter read aloud by the clerk during the solemnization of the marriage by the Judge. Approximately five days later the parties came to Los Angeles.

The property with which defendant was possessed at the time of his marriage, as listed in the agreement, was valued at approximately 170,000 American dollars, and 60,000 Peruvian soles; his debts amounted to approximately $53,000; at the time of the within trial his net worth was approximately $1,000,000. The prenuptial agreement (Exhibit F) provided, among other things, that the marriage of the parties "shall be contracted under the rule of absolute separate property" wherein each of the parties "shall retain the ownership and

control of their respective property'' (par. I) and ''all of the income and accruals therefrom shall not be community property but rather in the exclusive domain of the owner of said property'' (par. II), and ''the salaries, wages, emoluments and profits, deriving from any employment, or from the exercise of a profession, a business or an industry, shall also be privately owned by each of the spouses'' (par. IV) (Exhibit F; translation, Exhibit A, Findings of Fact). Thus it is clear, under the agreement and the evidence, that all of the property defendant possessed at the time of the suit for divorce was either his separate property listed in the agreement or was the fruit of such property or the product of his skill or labor. Appellant does not here claim that if the agreement be valid its provisions do not control the after-acquired property as well as that with which defendant was possessed at the time of the marriage—in other words, if the agreement is valid there is no community property.

■ Conceding that in California antenuptial agreements will be upheld where validly entered into, and predicating her argument on the rule that a confidential relationship is presumed to exist between husband and wife (*In re Cover Estate,* 188 Cal. 133 [204 P. 583]; Civ. Code, § 158), plaintiff submits that at the time the agreement was executed ''defendant owed to the plaintiff a high degree of fiduciary duty,'' which he violated (A.O.B., p. 13). Her position is without merit because when the agreement was entered into the parties were not yet married, and neither the law of Mexico nor the established rule in California presumes the existence of a confidential relationship between prospective parties to a marriage. Plaintiff has submitted no authority under the Mexican law (nor has our research thereof revealed any) to the effect that the confidential relationship which is presumed to exist between husband and wife also exists between the parties before their marriage. And we well understand why; such a rule in a jurisdiction wherein the parties are obliged to enter into prenuptial agreements before marriage would subject the contracts to constant attack and tend to destroy the intent and purpose of the law requiring them. Although it is still the custom in Mexico to submit to a religious ceremony, the fact that the parties were ''married'' by a priest immediately before they executed the agreement does not change their status. Under article 130, Constitution of Mexico, all validity of the religious marriage ceremony was abolished, and the relationship of husband and wife can

now be established only by civil ceremony before the Office of the Civil Registry. (Civil Code, arts. 35, 38, pp. 11, 12.) Further, the period during which they were "married," before the civil ceremony, was only that time required to drive the short distance from Cuernavaca to Mexico City.

Referring to California law, appellant dismisses the holding of *Handley* v. *Handley*, 113 Cal.App.2d 280 [248 P.2d 59]— that no confidential relationship is presumed to exist between prospective parties to a marriage—as *obiter dictum* and, in any event, inapplicable to the instant facts. But that rule, essential to the disposition of the *Handley* case, *supra*, does establish the law in this state; and although the separate and community claims are therein reversed the distinction does not prevent its application here. In *Handley* v. *Handley*, 113 Cal.App.2d 280 [248 P.2d 59], plaintiff wife held certain real property in her own name and in a divorce action asserted it to be her separate property; defendant husband claimed it as community property under an executed oral antenuptial agreement that the parties would treat all real property acquired subsequent to their marriage as community property. On appeal plaintiff conceded that the evidence was sufficient to warrant an implied finding that an oral antenuptial agreement existed, but denied the same had been executed. The court held that the oral agreement had been executed by the parties; then plaintiff contended that, even so, the agreement was fraudulent and void, based on section 158, Civil Code, which declares a confidential relationship is presumed to exist between husband and wife, and argued that the burden was on her husband to show that the agreement was fair, just and fully understood by her. The court rejected her position stating at page 285: "The simple answer to this argument is that section 158 has no application to the making of this oral agreement because the parties were not married when it was made, hence the confidential relationship did not, as a matter of law, exist and the parties could deal with each other at arm's length."

■ Nor do we find in the record before us that defendant was in fact guilty of any fraud, deceit or overreaching; or any implication thereof due to the difference in the ages and experience of the parties. It is unfair to compare defendant's then age and business experience with that of plaintiff; if a comparison is material, it should be made with that of her mother, plaintiff's only living parent and guardian, who represented her, a minor, in all of the proceedings (Civil

Code, arts. 98, 148, 149, pp. 26, 38), who signed and approved the application for marriage and the antenuptial agreement (Exhibits A, F), and with whom defendant dealt prior to the marriage. Plaintiff's reference to her mother as one "as uninformed and inexperienced as her daughter" (A.O.B., 10, 11), fails to take into account her own testimony and that of defendant, the sister of plaintiff's mother and plaintiff's cousin. Plaintiff's mother was then 50 years old, a national and resident of Mexico, and a guide and interpreter at the Museum in Cuernavaca, which job required her to have not only the ability to translate Spanish into English and a thorough knowledge of the history, usage and customs of Mexico, but two years' study of history. She had previously lived in Chicago where she studied English and worked for Montgomery Ward and Company; having attended a trade school to learn secretarial work, she became a secretary in a bank in Mexico City. With her experience and her knowledge of the history, customs and language of her own country, it is a reasonable inference that she was generally aware of the two regimes and the necessity of a prenuptial agreement. In any event, it is certain that she knew of them and became aware of the effect of each regime when she heard the matter explained in detail to the parties by the clerk of the Office of the Civil Registry on January 16; when she, plaintiff and defendant then and there in the office discussed the situation, including his financial holdings; and when she thereafter, on several occasions at her home in Cuernavaca talked over the matter of his property with defendant. And surely, in view of the prior discussions, she had knowledge of the nature of the agreement and was aware of its consequences on January 23, when she signed the same with its list of properties and debts, and heard it read aloud by the clerk as part of the marriage ceremony. Compared with defendant, a resident of Los Angeles, who first became aware of the two regimes and the necessity of the prenuptial agreement on January 16, when the three appeared at the Office of the Civil Registry, plaintiff's mother appears to have been the better informed.

Nor is plaintiff's assertion that neither she nor her mother understood the extent of defendant's property, borne out by the record. Defendant testified that before he was married he not only told plaintiff that he owned the property listed in the agreement and had several conversations with her about it, but discussed his worth with plaintiff's mother on "more occasions." Further, the agreement sets forth in detail

a list of all of defendant's holdings and their value, and his obligations, which document both plaintiff and her mother signed. Although plaintiff testified she was "absolutely positive" defendant never discussed his financial holdings, she later admitted that prior to her marriage she learned he had property on Spaulding Avenue in Los Angeles, she knew he owned an apartment house where she and her aunt stayed when they visited defendant in Los Angeles before her marriage, he did tell her he was remodeling a 17-room house in Beverly Hills which he owned, and she knew that he had at least two properties. Defendant further testified that on January 16, in the Office of the Civil Registry he discussed his properties with plaintiff and her mother, and that preparatory to submitting a list of his properties to the clerk of the Office of the Civil Registry, he several times talked to plaintiff and her mother in Cuernavaca about his holdings; that "we both talked about and we decided it was very much better to marry under this separate Property" and on "many occasions" the family talked about it.

It does not appear to have been a "whirlwind courtship," but one providing ample opportunity for discussion and inquiry concerning defendant's worth; and during which courtship plaintiff, with her aunt and uncle, visited defendant in Los Angeles and defendant made several visits to Mexico to see plaintiff. There being no evidence that plaintiff's mother was not then on friendly terms with defendant—the evidence shows that the parties and their families were well known to each other through intermarriage—it is reasonable to infer that she discussed with defendant, at some length, her daughter's welfare and future. It is difficult to believe that she, plaintiff's only living parent and guardian, who had brought up plaintiff "in the old Spanish—the cloistered—sense" (A.R.B., p. 4) would permit her only child to marry and leave her native Mexico, without concerning herself with defendant's financial position and how he intended to care for her. It is significant also that on the last page of the agreement bearing the signatures of plaintiff, defendant and plaintiff's mother, are listed separately, and described, each of defendant's properties on the left and center of the page and the corresponding value of each on the right—all in Spanish— immediately preceding the signatures of the parties. That plaintiff's expert on Mexican law (Mr. Jurado) believed it to be significant that she did not have legal advice prior to sign-

ing the agreement, even if accepted by the trial court, would not, under the instant facts, be material—certainly not essential. (*Estate of Sayegh*, 118 Cal.App.2d 327 [257 P.2d 995].) The error of plaintiff's statement in her brief, and in her oral argument, that ''[q]uite evidently the prospective husband procured and obtained the agreement with the assistance of the lawyers,'' is clearly apparent from the record, for not only did defendant testify that he consulted no lawyer concerning the election to marry under the separate properties regime or the execution of the agreement, but it is evident that defendant did not even know of the two systems until confronted with them by the clerk on January 16; and that thereafter he acted solely on the information given to them by the clerk and pursuant to his discussion there with plaintiff and her mother. The evidence shows he submitted to the clerk a list of his properties on the form she gave him, and that neither he nor any lawyer had anything to do with the preparation of the agreement; nor did any counsel inspect the same on behalf of defendant. It was the clerk who prepared and typed the agreement for signature and in whose hands it remained until the ceremony; and the first time defendant ever saw the document was when it was handed to him and plaintiff in the Office of the Civil Registry just prior to the ceremony.

Plaintiff asserts that, in any event, the agreement was not duly executed according to Mexican law in that—it was not read aloud to the parties, its legal effect was not explained to them, it involved realty in value in excess of 5,000 pesos and it was not presented to the head of the Office of the Civil Registry, and there is nothing to show that plaintiff signed it as a minor or was legally represented by her mother. Plaintiff presents an extensive factual argument pointing up certain evidence favorable to her, but it fails to sustain her burden of demonstrating wherein the proof in the record before us is insufficient to support the findings. (*Carvalho* v. *McCoy*, 128 Cal.App.2d 702 [276 P.2d 21].)

Referring to her contention that the clerk did not, in accord with the obligation imposed by article 98, section V, Civil Code, explain ''to the interested parties all they needed to know, so that the agreement may be formulated,'' we refer first to defendant's testimony. He said that it was on January 16, in the Office of the Civil Registry, he first discovered there were two regimes under which they could be married—''[W]e asked for explanation, and they explain'';

the clerk explained the difference "in the two ways of getting married"; that the clerk asked both of them if they had property—plaintiff said she had none, he said he had property in Los Angeles; then the clerk explained: "If you marry under separate property, it means that you retain everything you have and everything that you are going to earn in the future . . . If . . . you marry under the community property, everything is common, and even if she divorce in a month, she is going to get one-half of your property"; that plaintiff and her mother were present and heard this explanation and that then and there they talked about "what we have, and what we are going to have . . . and talked about that and we agreed it was the method under which we was to get married"; that they then inquired of the clerk how they were "going to do it" and she told them, "They have a blank over there to fill" and the only thing you have to do is fill it in—give a list of everything you own; and that he took the forms with him and thereafter several times discussed the matter with plaintiff's mother in her home before submitting the list to the Office of the Civil Registry on January 20.

Plaintiff was positive in her denial that neither she nor her mother was even present in the Office of the Civil Registry or in Mexico City on January 16, but the great weight of the evidence is to the contrary. Aside from the testimony of defendant, and that of the clerk that plaintiff and her mother were present, the physical evidence contradicts plaintiff's denial. The face of each document discloses that both the marriage application (Exhibit A) and the form containing the statistical data (Exhibit E) were completed on January 16 in the Office of the Civil Registry in Mexico City, and then and there signed by defendant, plaintiff and plaintiff's mother. Miss Bernaldez, the clerk, not only also signed these documents, but testified that the initials "S.C.B.," appearing above defendant's name on the statistical date form (Exhibit E), were written by her in the office on January 16 when the parties personally made their election known to her, as indicating their intention to be married under the separate properties regime. Further, the official summary of the proceedings on January 16 and 23 in the Office of the Civil Registry (Exhibit D) bears the names and signatures of both plaintiff and her mother, showing their presence on January 16. Plaintiff's antenuptial medical examination also discloses the presence of plaintiff in Mexico City on January 16. In

addition, the custom of Mexico (testimony of Mr. Jurado) and the Mexican law (Civil Code, art. 99, par. V, pps. 26-27) make it necessary for both plaintiff (a minor), and her mother to be present, and the clerk to inform them about the agreement, before the application for marriage can be filed and the date of the marriage set.

Nor is there merit to plaintiff's claim that the agreement was not read aloud to the parties at the time of the marriage. Defendant testified that on January 23, the clerk handed him the antenuptial agreement which he read and then checked for mistakes; that plaintiff ''did exactly the same thing''—read it and saw the list of property, all in the presence of plaintiff's mother who also saw, signed and approved the agreement; that thereafter the agreement (Exhibit F) including the list of defendant's properties and their value, was read aloud by the clerk during the marriage vows. The clerk who was present during the ceremony testified she read the document aloud; another witness, Mrs. Rodriquez, testified she remembered it because it mentioned a farm in Peru and she ''surely'' remembered it was read aloud before the parties were married; the law and custom of Mexico require that the agreement be read aloud (Civil Code, art. 102, p. 28) ; and the marriage certificate (Acta de Matrimono) on file in the Office of the Civil Registry (Exhibit G) recites that the antenuptial agreement was read aloud during the ceremony. No evidence was permitted to impeach or vary the recitals of the facts contained in the marriage documents (Exhibits A through G) as they appear in the Civil Registry, although proof that the agreement was read aloud was received on the issue of whether plaintiff and her mother knowingly entered into the same.

Plaintiff's argument that the agreement is invalid because it involved real property in excess of 5,000 Mexican pesos and was not presented to the head of the Office of the Civil Registry, and that there is nothing in the records to show that plaintiff was legally represented by her mother, who had the legal capacity to serve, is predicated entirely on the opinion of plaintiff's expert, Mr. Jurado. Mr. William Stern, defendant's expert, testified to the contrary, supported by citation of authorities. It is significant that neither appellant nor Mr. Jurado has cited in support of the latter's opinion any pertinent section of the Civil Code of Mexico or any other legal authority under Mexican law. Thus, it was for the lower court to resolve the conflict in the testimony of the

two experts (*Wilson* v. *Foley*, 149 Cal.App.2d 726 [309 P.2d 97]); it is obvious that it, as it had a right to do, rejected Jurado's opinion in favor of that of Dr. Stern (Findings of Fact, par. XIII).

By deposition Mr. Jurado testified that any such agreement involving real property of a value in excess of 5,000 Mexican pesos must be in the form of a public document—notarized; and that the law requires a recital in the agreement itself, or a separate document, showing the legal capacity of the person representing the minor. However, Dr. Stern testified that under Mexican law it was not necessary that the document be presented in a public writing (notarized) unless it effectuated a transfer of property between husband and wife, (here it did not) even though the value of the real property is in excess of 5,000 pesos. This opinion was supported by case law submitted by Dr. Stern in Exhibit S (Memorandum to Counsel). It was also Dr. Stern's opinion that there is no requirement in Mexican law that a document reflecting the legal capacity of a minor's guardian be made a part of the Civil Registry, or that a recital to that effect appear in the contract. Nevertheless, the documents show that plaintiff's mother signed them as a parent of plaintiff ("Padres de la Pretensa" [Exhibit C] and "Padres de la Contryente" [Exhibit F]); and the evidence discloses the fact that plaintiff's mother was then 50 years old, of normal mentality and well enough to be present at all times.

Aside from the bare assertion (*In re Steiner*, 134 Cal.App. 2d 391 [285 P.2d 972]; *Gantner* v. *Gantner*, 39 Cal.2d 272 [246 P.2d 923]) that "the court should have made provision for payment to the plaintiff if she should survive the defendant, or in the absence of such a judgment should have increased the monthly allowance" (A.O.B., p. 27), plaintiff offers no argument (*Sloan* v. *Stearns*, 137 Cal.App.2d 289 [290 P.2d 382]; *Clay* v. *Lagiss*, 143 Cal.App.2d 441 [299 P.2d 1025]; *Guillory* v. *Godfrey*, 134 Cal.App.2d 628 [286 P.2d 474]), makes no reference to the record, (*Eistrat* v. *J. C. Wattenbarger & Sons*, 181 Cal.App.2d 57 [5 Cal.Rptr. 77]; *Davis* v. *Lucas*, 180 Cal.App.2d 407 [4 Cal.Rptr. 479]; *Abrams* v. *Bendat*, 165 Cal.App.2d 89 [331 P.2d 657]) points up no error (*County National Bank etc. Co.* v. *Sheppard*, 136 Cal.App.2d 205 [288 P.2d 880]) or abuse of discretion (*McClellan* v. *McClellan*, 159 Cal.App.2d 225 [323 P.2d 811]) on the part of the lower court, refers to no evidence, and cites

no authority (*In re Steiner*, 134 Cal.App.2d 391 [285 P.2d 972]) in support of her second point that the award of alimony "was not fair, adequate or proper." Having failed to show that error was committed, and in view of plaintiff's concession at page 30 of her opening brief, we tend to discount her argument as without foundation. With respect to her counsel's accomplishments on her behalf in the court below, and in support of her last contention—that the attorney fees are inadequate—plaintiff represents to this court that although she feels the trial court did not grant her full justice in the matter of her property rights, "nevertheless, the efforts of her counsel were attended with *success*. The court ordered the defendant to pay to the plaintiff the sum of $1,500 per month" (A.O.B., p. 30) together with various other payments (emphasis added).

Nevertheless, a review of the record discloses no abuse of the trial court's discretion. (*McClellan* v. *McClellan*, 159 Cal.App.2d 225 [323 P.2d 811]; *DeSanto* v. *DeSanto*, 162 Cal.App.2d 126 [328 P.2d 463].) The decree awarded plaintiff $1,500 per month alimony until further order of the court, $3,000 for back taxes, $1,300 for a furniture payment, extraordinary doctor and dental bills, $300 per month for support of a minor son, such sums as defendant deems "reasonable and necessary" for support of an emancipated minor daughter, $4,000 additional attorneys fee and $1,463 in costs, the balance of the trust deeds in her possession having an original face value of $135,000, a $150,000 life insurance policy on defendant, and certain articles of furniture, jewelry, et cetera.

Plaintiff is 39 years old. The children are not under her care—the daughter married and divorced is now 19 years old; the son now 21, away at school, lives with his father when in the city. Plaintiff has separate funds consisting of notes secured by a deed of trust, stocks and bonds of a reasonable market value of at least $30,000 and a minimum face value of $60,000, the income from which is approximately $4,000 per year. Plaintiff has herein failed to demonstrate that she is not ablebodied, not in good health and not capable of working, and more important, that the funds she has been awarded are not adequate for her present needs. Further, using her own figures relative to the life expectancy of defendant, she will receive $207,000 in alimony at the rate of $1,500 per month. Defendant is 65 years of age and has never been employed although he has managed his own properties. There

is no community property. Whatever is paid to plaintiff must come from his separate property. Plaintiff's only complaint seems to be that defendant is worth a million dollars and will, in all probability predecease her. This alone hardly justifies a finding of abuse of the lower court's wide discretion in the matter.

 Nor do we find an abuse of discretion in the award of attorney's fees. Defendant has been required to pay $2,500 to plaintiff's first counsel; $10,000, prior to judgment, to present counsel, and $4,000 additional to him upon entry of judgment, together with $1,463 costs. In all, defendant has paid out for plaintiff's present counsel $14,000; in addition, the latter received from plaintiff a retainer of $5,000, making his total fee, $19,000. He has also received an allowance for this appeal. Again plaintiff's main complaint seems to be that defendant is a millionaire and "possesses the financial capacity to respond" (A.O.B., p. 31) to a larger award. Although predicating her argument that the sum of $19,000 is inadequate and unfair upon "the time spent, the result accomplished, the nature and importance of the case, the difficulty of the questions presented, the strength of the opposition, the standing, skill and experience of the lawyer, and the financial ability of the party called upon to pay" (A.O.B., p. 28), appellant has failed to show either that all of these matters were before the trial court for its consideration, or that the court below abused its discretion on the basis of those which were presented to it.

Plaintiff points up for "the time spent," 526½ hours which her counsel represented to the court below he had worked on the case; if this time was accepted by the trial court, counsel was paid at the rate of approximately $36 per hour. To indicate "the result accomplished," she refers to the "success" of her alimony and other awards; but the fact is that she was unsuccessful in establishing the existence of community property and does not feel that the awards of alimony and other incidental allowances are "fair, proper or adequate" (A.O.B., p. 26), hence this appeal. In connection with "the nature and importance of the case" and the difficulty of the questions presented, plaintiff's counsel represented to the trial court that there were complexities and unusual proceedings under the Mexican law. The issues were primarily of a factual nature. Perhaps counsel's difficulty arose out of the need for a translation of the law of Mexico,

but once determined, the procedure appears to have been controlled entirely by statute. Basically, the case was a divorce action, made extensive only by the elapsed time and language barrier. ''The strength of the opposition'' is apparent from the record, but the trial court was in the best position to determine the vigor and skill with which the cause was prosecuted. However, of importance here, is the failure of plaintiff to offer to the trial court evidence of her counsel's ''standing, skill and experience.'' The burden is on the professional person seeking to establish the reasonable value of services rendered, to show not only his standing in the profession, but the customary fees charged for similar services. This is of course accomplished by proof of counsel's past earnings, his customary charges or fees prior to rendering the services, the length of time he has practiced, his past experience and its extent in the kind of service rendered, the nature of his practice (*Citron* v. *Fields,* 30 Cal.App.2d 51 [85 P.2d 534]), his repute and that of opposing counsel (*Dietrich* v. *Dietrich,* 41 Cal.2d 497 [261 P.2d 269]; *Pope* v. *Pope,* 107 Cal.App.2d 537 [237 P.2d 312]), whether other employment was lost because of the undertaking, and the customary charges of the Bar for similar services. (Canon 12, Canons of Judicial Ethics, American Bar Association.) Without these factors before the court below, we cannot say on the basis of what was offered that it abused its discretion in determining that $19,000 was the reasonable value of the services rendered.

Inasmuch as other points relative to the lower court's error in excluding evidence to impeach or vary the recitals contained in the official records of the marriage documents as they appeared on file in the office of the Civil Registry of the government of Mexico (A.R.B., p. 2), and to the failure of the lower court to apply California law ''to control the marital property rights and relations'' of the parties (A.R.B., p. 5) were not raised by appellant until her reply brief; and issues directed to appellant's complaint that she was confronted with a ''bifurcated'' trial in which the issue of the validity of the antenuptial agreement was first heard, and to her assertion that the basis of her failure to receive a higher allowance for attorney's fees to be the ''offense'' the trial judge took of her counsel personally, were not raised until oral argument, we refrain from passing further comment concerning them. (*People* ex rel. *Department of Public Works* v. *McCullough,* 100 Cal.App.2d 101 [223 P.2d 37]; *Utz* v. *Aureguy,* 109 Cal.App.2d 803 [241 P.2d 639]; *Richard* v.

*Richard,* 123 Cal.App.2d 900 [267 P.2d 867]; *Grayson* v. *Grayson,* 132 Cal.App.2d 471 [282 P.2d 565].)

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 11, 1961.